Kegan A. Brown
Taylor R. West (*pro hac vice* to be filed)
Youlan Xiu (*pro hac vice* to be filed)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: kegan.brown@lw.com
Email: taylor.west@lw.com
Email:  youlan.xiu@lw.com

*Attorneys for Plaintiff Paddock Enterprises, LLC*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| PADDOCK ENTERPRISES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Civ. Action No. 5:22-cv- 1558<br><br>Civil Action<br><br>**COMPLAINT** |

Plaintiff Paddock Enterprises, LLC, successor by merger to Owens-Illinois, Inc. ("Paddock"), by and through its attorneys, hereby brings this Complaint against Defendant United States of America ("United States") and states as follows:

## NATURE OF THE ACTION

1.    This action seeks to hold the United States responsible for environmental contamination on its property that the United States has known about, but failed to remediate, for decades.  As a consequence of the United States' failure to address the contamination on its property years earlier, Paddock has incurred response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C § 9601 *et*

1

*seq.*  Paddock now seeks to recover those past response costs and any future response costs incurred from the United States.

2.      In 1984 and 1985, the United States knowingly purchased approximately 30 acres of contaminated property known as the Jaite Paper Mill ("Jaite Mill").  Jaite Mill is a former paper mill and corrugated box plant, adjacent to the Cuyahoga River and Brandywine Creek, and located within the Cuyahoga Valley National Park ("CVNP") in northeastern Ohio.

3.      By acquiring Jaite Mill in its environmentally contaminated condition, the United States reaped a significant financial benefit because the contamination reduced the value of Jaite Mill at a time when the United States was trying to acquire land for the CVNP with limited appropriations funding from Congress.

4.      With the intent of acquiring Jaite Mill as inexpensively as possible, the United States took the unusual step of ***urging*** the Ohio Environmental Protection Agency ("Ohio EPA") to forbear from requiring a previous Jaite Mill owner and operator, Tecumseh Corrugated Box Company (now known as TCBC II, Inc.) ("TCBC"), to address known, longstanding environmental contamination caused by TCBC's operations.

5.      Upon information and belief, the United States did not want TCBC to address the contamination at Jaite Mill because if TCBC actually did so, Jaite Mill likely would have increased in value and cost the United States more to purchase it for the CVNP.

6.      Despite having urged Ohio EPA not to require TCBC to address the known contamination at Jaite Mill, and despite the passage of CERCLA in 1980 that imposes liability on current owners and operators for contamination on their property, the United States did not immediately begin investigating and remediating the contamination when it purchased Jaite Mill

2

in 1984 and 1985.  Nor did the United States take any action to require TCBC to investigate and remediate the contamination.

7.      Instead, the United States made Jaite Mill – a known contaminated property – accessible and open to the public as part of the CVNP.

8.      It was not until 2004 – *nineteen (19) years* after acquiring Jaite Mill – that the United States even started to investigate contamination at Jaite Mill in earnest.  It then took the United States another *sixteen (16) years* (*i.e.*, until 2020) to complete its investigation of that contamination.  Ultimately, the United States took *thirty-five (35) years* after purchasing Jaite Mill to delineate contamination that the United States knew existed prior to acquiring the property.

9.      Not surprisingly, given the United States' multi-decade delay, the state of contamination in soils, groundwater, surface water, and sediments at and adjacent to Jaite Mill had worsened.  As a consequence, the cost to address the contamination today is likely greater than what it would have been in 1985 (or even before 1985, if the United States had let Ohio EPA require TCBC to investigate and remediate the contamination).

10.     The United States currently estimates that it will cost approximately $45 million to remediate Jaite Mill to a pristine, unimpaired condition that the United States incorrectly asserts CERCLA requires.

11.     In 2018, the United States requested that Paddock, which formerly owned and operated Jaite Mill through a predecessor from 1951 until 1967, perform a time-critical removal action under CERCLA to stabilize a portion of the Jaite Mill property that abuts the Cuyahoga River.  In connection with the United States' request, Paddock incurred necessary CERCLA

response costs at Jaite Mill consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP").

12.     As the current owner and operator of Jaite Mill, the United States is liable for Paddock's past response costs incurred at Jaite Mill, and any future response costs Paddock may incur at Jaite Mill, including with respect to the United States' selected $45 million remedy to address the contamination.

13.     Through this action, Paddock seeks (i) a declaration of the United States' liability for Jaite Mill contamination under both CERCLA and the Declaratory Judgments Act, 28 U.S.C. § 2201 *et seq.*, (ii) to recover Paddock's past necessary response costs incurred at Jaite Mill under CERCLA, and (iii) to obtain a declaratory judgment that the United States is liable for Paddock's future necessary response costs, if any, incurred at Jaite Mill under both CERCLA and the Declaratory Judgments Act.

## PARTIES

14.     Paddock is a Delaware limited liability company with its headquarters in Perrysburg, Ohio.

15.     Paddock is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

16.     The United States is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

## JURISDICTION AND VENUE

17.     This action arises under Section 107 of CERCLA, 42 U.S.C. § 9607, and the Declaratory Judgments Act, 28 U.S.C. § 2201.

18.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 because Paddock's claims arise under federal law and district courts have exclusive original jurisdiction over CERCLA claims, 42 U.S.C. § 9613(b).

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) and 42 U.S.C. § 9613(b) because the events giving rise to Paddock's claims occurred in this District.  In addition, the Jaite Mill at which Paddock incurred necessary response costs is located entirely within this District.

20.     In accordance with 42 U.S.C. 9613(*l*), Paddock has provided a copy of this Complaint to the Attorney General of the United States and the Administrator of the United States Environmental Protection Agency ("USEPA").

## STATEMENT OF FACTS

### Congress Created the Cuyahoga Valley National Park for Recreational Space Knowing the Cuyahoga River and Nearby Valley Lands Already Were Contaminated

21.     Jaite Mill is located within the CVNP, an area Congress envisioned would provide recreational space to citizens living in and visiting the Cuyahoga Valley region of the country.

22.     The United States understood that Cuyahoga Valley lands acquired for the CVNP might have environmental contamination, in no small part due to the enduring contamination of the Cuyahoga River and the Cuyahoga Valley's location between the cities of Cleveland and Akron.

23.     On December 27, 1974, Congress passed legislation that established the Cuyahoga Valley National Recreation Area, which was later renamed the Cuyahoga Valley National Park on October 11, 2000.  *See* 16 U.S.C. § 460ff  (the "CVNP Act").

5

24.    CVNP spans nearly 33,000 acres in the Cuyahoga Valley, which runs along the banks of the Cuyahoga River between Cleveland and Akron.

25.    Long before CVNP was designated as federal recreational land, the State of Ohio had undertaken efforts to preserve recreational space for citizens living in and visiting the greater Cleveland and Akron areas.

26.    In the early twentieth century, the State of Ohio established state metroparks in the Cuyahoga Valley, providing open recreation areas that could be used for picnics, camping, sports, and walking.

27.    In 1929, local Ohio businessman F.A. Seiberling donated privately owned land to the State of Ohio to increase the amount of land that could be preserved for recreational purposes.

28.    In 1966, the Federal Bureau of Recreation and the National Park Service, both agencies of the United States, conducted a Recreation Feasibility Study on the Cuyahoga Valley to consider whether it should be eligible for federal preservation.  The agencies reported they had never seen such a polluted waterway as the Cuyahoga River.

29.    The 1966 Recreation Feasibility Study concluded that the Cuyahoga Valley was not worthy of federal preservation because (i) the contaminated Cuyahoga River would prevent water-related recreational activities, and (ii) the Cuyahoga Valley did not possess any outstanding natural values.

30.    By the mid-1960s, the Cuyahoga River had become infamous for its pollution, having caught on fire more than a dozen times dating from the 1860s.

31.    In June 1969, parts of the Cuyahoga River caught on fire and burned for three (3) days straight.  Following the media attention on the infamous river fire, the United States

identified six (6) industrial companies in Cleveland that were responsible for the discharge of hazardous substances into the Cuyahoga River.  Neither Paddock nor its predecessor were identified as one of these six (6) companies.

32.     In 1970, John F. Seiberling (the grandson of F.A. Seiberling), was elected to the U.S. House of Representatives for Ohio's 14th congressional district.  John F. Seiberling, like his grandfather, sought to preserve additional recreational space in the Cuyahoga Valley.  In his view, federal preservation of a national recreation area in the Cuyahoga Valley was urgently needed because of rising land prices in the Cuyahoga Valley and imminent encroachment from developers.

33.     In 1971, newly-elected U.S. Congressman Seiberling proposed a bill to create the "Ohio Canal and Cuyahoga Valley National Historical Park and Recreation Area" that would place the Cuyahoga Valley under the management of the National Park Service as a national park.  This bill never received a committee hearing in either U.S. chamber.  Seiberling, however, persisted in his effort to have a Cuyahoga Valley recreation space federally recognized.

34.     In March and June of 1974, the U.S. House of Representatives held two (2) hearings to gauge public support for a national recreation area in the Cuyahoga Valley.

35.     Supporters of a national recreation area believed that only the federal government had the financial resources and ability to win the race against developers who were increasingly purchasing land in the Cuyahoga Valley.

36.     Opponents of a national recreation area, in contrast, saw the existing, known environmental contamination as a practical impediment to using Cuyahoga Valley land for recreation.  In 1971, local residents sent a letter to the United States explaining that "[t]here is NO discussion about the ***enormous costs of removing the pollution*** which really negates the use

7

of the area, in safety, for the public."  (Emphasis in italics added).  This same point was made again during an April 8, 1974 Senate hearing, where citizens opposed to a national recreation area in Cuyahoga Valley explained that any proposed camping, picnicking, boating, fishing, hunting, and hiking were impossible because "[i]t is beyond our belief that anyone can say the area of the Cuyahoga River valley by virtue of pollution is conducive to these activities."

37.     The U.S. House and Senate Reports from December 1974, issued just weeks before the CVNP Act was passed, also acknowledge the presence of contamination in the Cuyahoga River.

38.     Federal agencies, including the Office of Management and Budget and the Department of Interior ("Interior"), were staunchly opposed to the creation of the CVNP.  The Office of Management and Budget took the position that the Cuyahoga Valley possessed no qualities that would qualify it for inclusion in the National Park System, and Interior did not see a need for federal involvement where the State of Ohio had already begun preserving land in the region.

39.     Interior also opposed creation of the CVNP because creating a national park in the Cuyahoga Valley would set a precedent for an urban recreation area near every large city in the country.

40.     Nevertheless, Congress passed the CVNP Act to create the Cuyahoga Valley National Recreation Area.

41.     Despite objections from the Office of Management and Budget, Interior, and his advisors, President Ford signed the CVNP Act into law on December 27, 1974.

42.     Even after the CVNP was created, Interior reiterated its prior position that the CVNP lacked any intrinsic value beyond its recreational opportunity.

8

43.     In a February 20, 1975 hearing before the U.S. House Subcommittee of the House Committee on Appropriations, then-Secretary of Interior Rogers Morton stated:  "let's face it, the establishment of Cuyahoga Valley in Ohio is a set-aside that ***primarily is not for its primitive or natural values***; it is in fact that it is ***open space*** and in that open space you can develop a tremendous amount of ***recreation opportunity***."  (Emphasis added).

<u>The Troubled CVNP Land Acquisition Plan and Rising Property Values in the Cuyahoga Valley Required the United States to Acquire Land for CVNP As Cheaply As Possible</u>

44.     The United States saw environmental contamination of the land it sought to acquire for the CVNP as a benefit because contaminated land was cheaper to acquire than uncontaminated land, and a poorly-managed federal land acquisition process for the CVNP caused delays while land prices in the Cuyahoga Valley skyrocketed.

45.     Upon passage of the CVNP Act, the Secretary of Interior was authorized to "acquire lands, improvements, waters, or interests" within the proposed boundaries of the CVNP. 16 U.S.C. § 460ff-1(a).  Daily management of the CVNP, in turn, would be the responsibility of the National Park Service, an agency within Interior.

46.     The CVNP Act provided that the land necessary to create the CVNP would have to be acquired by donation, purchased with donated or appropriated funds, exchanged, or transferred within six (6) years from the date of enactment of the legislation (*i.e.*, by 1980).  16 U.S.C. § 460ff-2(b).

47.     The funds appropriated by Congress were not designated to purchase specific properties.  Instead, the Secretary of Interior was required to establish an acquisition plan that indicated the order in which property for the CVNP would be acquired with the funds appropriated.

48.     Due, in part, to the economic recession and political instability surrounding the conflict in Vietnam in the mid-1970s, federal spending on national parks was stymied.  For example, President Nixon's 1974 budget proposal provided no increase in planning, development or operation of National Park Service-managed recreation programs, which Congressman Seiberling criticized as shortsighted because he anticipated CVNP land prices would continue to escalate.

49.     In 1975, Secretary of Interior Rogers Morton, who had opposed the creation of the CVNP, requested only $1 million for the CVNP land acquisition program for fiscal year 1976.  Certain members of Congress, however, petitioned to increase the CVNP appropriations to $5 million.

50.     The difficulty of acquiring land for the CVNP due to a lack of Congressional appropriations was compounded by the United States' lack of a formal land acquisition plan.

51.     By statute, the Secretary of Interior was required to submit a land acquisition plan to Congress by December 27, 1975 that would provide the public with a comprehensive explanation of the intended CVNP land acquisition program.  16 U.S.C. § 460ff-2(a).

52.     Nevertheless, an adequate land acquisition plan was never submitted by Interior. Instead, on December 11, 1975, Interior submitted an acquisition schedule to Congress, which Congress rejected because it did not qualify as a land acquisition plan.

53.     In the absence of a land acquisition plan, then-CVNP Park Superintendent Bill Birdsell made decisions about which properties would be acquired by the United States in fee simple and when those property acquisitions would occur.

54.     By mid-1976, land prices in the Cuyahoga Valley were escalating by ten to fifteen percent (10%-15%) a year.  As a result, if the CVNP was to be realized within the 6-year time

10

period mandated by the CVNP Act, the amount of Congressional appropriations had to be increased significantly.

55.     By the end of President Carter's Administration in 1980, the United States had already spent approximately $59 million on roughly 11,000 acres for the CVNP, with thousands of acres remaining to be acquired.

56.     In 1981, however, President Reagan's Administration placed a moratorium on all national park land purchases.

57.     In addition, the new Secretary of Interior James G. Watt suggested de-authorizing national parks like CVNP and reprogramming its funds, an approach that resulted in Watt being featured in an editorial cartoon in the Akron Beacon Journal.



**Figure 12:**     This editorial cartoon captures the cavalier attempts of Interior officials (Secretary James Watt, in particular) to eject units like the Cuyahoga Valley National Recreation Area from the National Park System. (Source: Chuck Ayers, *Akron Beacon Journal*, 24 October 1981)

58.     Secretary Watt resigned in September 1983.  His replacement, William Clark, reversed the previous moratorium and requested $5 million for the CVNP for fiscal year 1984.

59.     As explained below, Jaite Mill was among the properties finally acquired post-moratorium in 1984 and 1985.

60.     By 1985, the United States had spent over $85 million to acquire approximately 15,000 acres for the CVNP.

<u>Before the United States Acquired Jaite Mill, Congress Passed CERCLA</u>

61.     Prior to acquiring Jaite Mill in 1984 and 1985, the United States already was aware that, to the extent Jaite Mill was contaminated, the United States would be legally obligated to investigate and remediate that contamination if it purchased Jaite Mill.

62.     On December 11, 1980, Congress passed CERCLA.

63.     Under Section 107 of CERCLA, there are four (4) categories of liable parties:  (i) current owners or operators of the relevant CERCLA facility, (ii) former owners or operators at the time a hazardous substance was disposed of at the relevant CERCLA facility; (iii) persons who arranged for the treatment or disposal of hazardous substances at the relevant CERCLA facility; and (iv) persons who transported hazardous substances to the relevant CERCLA facility for treatment or disposal.  42 U.S.C. § 9607(a).

64.     Response actions under CERCLA are classified as either "removal" actions or a "remedial" action.

65.     A removal action is a response that is undertaken in the short-term to monitor, assess, or abate the release of hazardous substances to the environment or the threat of release of hazardous substances to the environment.  42 U.S.C. § 9601(23).  Importantly, a removal action is not a permanent remedy for environmental contamination.

66.     In contrast, a remedial action is an action "consistent with [a] permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."  42 U.S.C. § 9601(24).

67.     To recover costs incurred to perform a removal action or a remedial action under CERCLA, the removal action or remedial action must be undertaken in a manner that is consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"). The NCP provides detailed requirements for when and how a removal action or a remedial action may be performed under CERCLA.

<u>The United States Acquired the Contaminated Krejci Dump for the CVNP and then
Investigated and Remediated Krejci Dump Contamination</u>

68.     By the time CERCLA was passed in 1980, the CVNP had been in existence for six (6) years.  Beginning in 1981, the United States invited inspectors from Ohio EPA to evaluate potential environmental contamination at a nearby property known as the Krejci Dump.  The Krejci Dump is a forty-seven (47) acre property that had been used as a salvage yard and disposal facility from 1948 until 1980.  In 1985, the United States acquired Krejci Dump and made it part of the CVNP.

69.     In mid-1986, the United States received new information regarding environmental contamination at the Krejci Dump, and promptly invited Ohio EPA to conduct a full site investigation.  The Krejci Dump was closed to visitors in May 1986 to ensure visitor safety and prevent resource degradation.

70.     By June 1987, the United States had confirmed the presence of hazardous substances at Krejci Dump, and began onsite action to further investigate and remediate the contamination.

71.     In 1989, as a result of the substantial costs incurred by the United States at the Krejci Dump, Interior instructed the National Park Service to purchase no more lands for the CVNP with environmental contamination.  Then Secretary of Interior Manuel Lujan subsequently imposed a requirement that the National Park Service would have to conduct inspections for hazardous substances before any tract of land could be purchased.

<u>The United States Intended to Acquire Jaite Mill<br>and Preserve It as a Historically Significant Location</u>

72.     Since inception of the CVNP, Jaite Mill was one of the properties the United States intended to acquire as part of the national park.

73.     As early as 1974, the United States publicly announced its intention to obtain the "box plant" (*i.e.*, Jaite Mill) as part of the CVNP.

74.     On March 19, 1979, the Heritage Conservation and Recreation Service, an agency within Interior, nominated Jaite Mill and the surrounding unincorporated town of Jaite for The National Register of Historic Places.  Jaite Mill was listed in the National Register in 1979.

75.     The National Register of Historic Places was established by Congress in the National Historic Preservation Act of 1966.  This statute was enacted to carry out the "policy of the Federal Government to… administer federally owned, administered, or controlled property in a spirit of stewardship for the inspiration and benefit of present and future generations [and] contribute to the preservation of nonfederally owned historic property[.]"  54 U.S.C. § 300101(3)-(4).

14

76.     The Secretary of Interior maintains the National Register of Historic Places and may record "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, engineering, and culture." *Id.* § 302101.

77.     As set out in Interior's National Register of Historic Places Inventory Nomination Form, Jaite Mill and the associated Jaite company town had a special character and was one of the most important business enterprises in that section of Summit County in Ohio.

78.     The Jaite Mill was also recorded in the Historic American Engineering Record, a project undertaken by the National Park Service, the Library of Congress, and the American Society of Civil Engineers to "create a permanent documentary record of the nation's engineering and industrial legacy."

<u>The United States Knowingly Acquired Jaite Mill with Environmental Contamination to Keep the Purchase Price of Jaite Mill Reduced</u>

79.     Prior to purchase, the United States was aware of contamination at Jaite Mill because of years-long environmental violations issued by the Ohio EPA against Jaite Mill's then-owner and operator, TCBC.

80.     Acting out of its own self-interest to keep the potential purchase price for Jaite Mill deflated (and thus within Congressional appropriations), the United States interfered with demands by Ohio EPA to have TCBC timely address Jaite Mill contamination.

81.     Prior to TCBC's acquisition of Jaite Mill in 1967, two (2) other companies had owned and operated the plant: Jaite Paper Company from 1905 until 1951, and National Container Corporation from 1951 until 1967.

82.     Paddock is the successor to National Container Corporation, but not Jaite Paper Company.

83.    TCBC had a well-documented record of its operations causing environmental contamination at Jaite Mill.

84.    As early as February 1975, TCBC and the City of Akron were engaged in a dispute regarding TCBC's wastewater effluent discharge into the Cuyahoga River.

85.    In July 1975, TCBC recognized the need for the company to preserve cash because of the possible shutdown of Jaite Mill by the United States, coupled with its knowledge of the environmental contamination TCBC's operations had caused at Jaite Mill.

86.    In 1976, the Ohio EPA issued a notice of violation to TCBC for noncompliance with its wastewater discharge permit.  This violation resulted from TCBC's failure to maintain its wastewater treatment lagoons at Jaite Mill, which resulted in the discharge of contaminated wastewater directly into Brandywine Creek and the Cuyahoga River.

87.    Despite receiving this notice, on July 25, 1979, TCBC decided not to conduct a complete study of its wastewater effluent from Jaite Mill because of the cost of paying a consultant to perform the study.

88.    Also in 1976, TCBC became aware of its noncompliance with new air emission limits for sulfur dioxide that were imposed under the federal Clean Air Act.  *See* 42 U.S.C. § 7401 *et. seq.*  TCBC had several conversations with USEPA in November 1976 regarding the possibility of TCBC avoiding the necessity of complying with the Clean Air Act.

89.    On January 24, 1977, TCBC attempted to negotiate a protracted schedule with USEPA to bring Jaite Mill into compliance with the sulfur dioxide air emission requirements.

90.    During those negotiations, TCBC informed USEPA that expending capital to comply with the sulfur dioxide air emission requirements ultimately would have financial consequences for the United States' acquisition of Jaite Mill for the CVNP.  Specifically, TCBC

16

explained that modifications necessary to achieve the sulfur dioxide air emission requirements would increase the value of TCBC's fixed equipment, which in turn would increase the cost to the United States of acquiring Jaite Mill for the CVNP.

91.     Approximately one (1) year later, on January 16, 1978, the United States inspected Jaite Mill.

92.     On July 13, 1979, TCBC met with CVNP Superintendent Bill Birdsell to discuss Interior's plans to acquire Jaite Mill.  During this meeting, TCBC raised its air emissions noncompliance with Birdsell as an ongoing issue.

93.     On December 8, 1980, USEPA ordered TCBC to pay a fine for exceedances of the sulfur dioxide emissions threshold.  To settle the issue, TCBC signed a consent decree and paid a fine.

94.     By the end of 1980, the United States still had not purchased Jaite Mill due to the Reagan Administration's moratorium on purchasing additional lands for national parks.

95.     Jaite Mill was among many properties that fell into years-long purchase negotiations between then-owners and the United States due to inconsistent federal funding and the disorganization resulting from a missing land acquisition plan for the CVNP.

96.     Because CVNP Superintendent Birdsell made decisions about which properties to purchase and when to purchase them for the CVNP, appraisals would be ordered years before any offer to purchase would be made, causing controversy and tension between landowners and Interior.

97.     On August 6, 1980, Ohio EPA conducted sampling at Jaite Mill to assess whether TCBC was complying with its wastewater discharge permit.  Ohio EPA informed TCBC that

TCBC's improper maintenance of settling lagoons at Jaite Mill caused wastewater effluent violations.

98.     Ohio EPA directed TCBC to rectify the wastewater effluent violations.

99.     On November 4, 1981, the United States confirmed to TCBC its continued interest in purchasing Jaite Mill subject to the availability of Congressional appropriations.

100.     In May 1982, Ohio EPA again notified TCBC of ongoing environmental violations resulting from TCBC's wastewater discharges at Jaite Mill.

101.     On July 20, 1982, the United States advised TCBC that it was ordering appraisals for certain parcels of Jaite Mill.

102.     On December 23, 1982, the United States filed a complaint with Ohio EPA about an oil and gas well on TCBC's property that was leaking oily, sludge-like material into a tributary of the Cuyahoga River.

103.     The United States filed the complaint with Ohio EPA because it had just acquired an adjacent property for CVNP and was concerned that the poor maintenance of TCBC's well would result in a large oil spill directly onto the United States' property and into the Cuyahoga River.

104.     On February 10, 1983, the United States accompanied the Ohio Department of Natural Resources to inspect TCBC's oil and gas well.

105.     The inspectors confirmed that the source of the oil contamination was a leaking tank on TCBC's property, which was allowing waste oil and other substances to leach into the Cuyahoga River.  The Ohio Department of Natural Resources issued a verbal notice of violation to TCBC and required TCBC to clean up the contamination and repair the leaking tank.

106.    On March 2, 1983, the Ohio Department of Natural Resources conducted another on-site inspection of TCBC, and issued a written notice of violation to TCBC because it found that slag had been spread on top of the contamination, but TCBC had not attempted to remove the contamination or repair the leaking tank.

107.    TCBC did not satisfactorily clean up the contamination stemming from its oil and gas well or fix the leaking tank until May 3, 1983.

108.    By 1983, the United States had begun negotiations with TCBC to purchase Jaite Mill via a "piecemeal acquisition strategy" that started with the acquisition of Jaite Mill parcels that did not include the plant, and concluding with the acquisition of the plant parcel, all subject to available funding.

109.    That same year, in May 1983, Ohio EPA again notified TCBC of ongoing environmental violations resulting from TCBC's wastewater effluent discharges at Jaite Mill.

110.    In July 1983, the United States toured the Jaite Mill plant in preparation for its acquisition.

111.    On September 15, 1983, Ohio EPA wrote a letter to TCBC, explaining that TCBC had not yet rectified its ongoing wastewater effluent violations.

112.    In the same letter, Ohio EPA explained that TCBC's settling ponds had not been dredged for over ten years, which Ohio EPA characterized as a "grossly excessive length of time."  Ohio EPA demanded that TCBC "come into compliance with its permit" because TCBC's wastewater effluent discharges were "seriously affect[ing] the receiving stream, Brandywine Creek, and the effect will be much more noticeable after a large sewage treatment plant just upstream connects to the Cuyahoga Valley Interceptor."  A copy of Ohio EPA's letter to TCBC dated September 15, 1983 is attached as Exhibit 1 to this Complaint.

113.    TCBC never rectified the ongoing environmental violations resulting from its wastewater effluent discharges.  Instead, TCBC sought to exert political pressure on Ohio EPA to ignore the contamination at Jaite Mill caused by TCBC's operations.

114.    On September 17, 1983, two (2) days after Ohio EPA's September 15, 1983 letter describing TCBC's neglect of its settling lagoons as "grossly excessive," TCBC met with U.S. House Representative John F. Seiberling to seek his intervention.  Specifically, TCBC sought to have the United States purchase Jaite Mill quickly – before any environmental compliance measures were required to address Ohio EPA's concerns.

115.    On September 19, 1983, two (2) days after TCBC met with Congressman Seiberling, William Miller, an Environmental Engineer at Ohio EPA, and Jack Blanton, a CVNP Land Acquisition officer with the United States, had a telephone conversation regarding Ohio EPA's position that TCBC's wastewater effluent discharges had been causing environmental contamination for years and had to be rectified.

116.    Instead of working with Ohio EPA to ensure that TCBC's contamination was promptly addressed, the United States took the unprecedented step of asking Ohio EPA to ignore TCBC's contamination and continued environmental violations.

117.    In a September 20, 1983 letter to Ohio EPA, the United States stated that "[i]n light of the Park's imminent acquisition plans, dredging of the settling ponds located in the Tecumseh property would adversely affect the area for park purposes…. ***Consequently, we encourage your office*** [*i.e.*, Ohio EPA] ***to withdraw your request for dredging in this area***, with the assurance that this office will diligently persue[sic] acquisition of the plant and thereby totally eliminate the wastewater discharge problem."  (Emphasis added).  A copy of the letter

20

from Jack Blanton (United States) to William Miller (Ohio EPA) dated September 20, 1983 is attached as Exhibit 2 to this Complaint.

118.    In 1984 and 1985, the United States purchased Jaite Mill from TCBC in a two-part sale.

119.    On February 17, 1984, the United States purchased the non-plant parcels of Jaite Mill for a total cost of $235,375.

120.    In early March 1984, Ohio EPA, TCBC, and the United States held a meeting in Columbus, Ohio to discuss TCBC's poorly treated wastewater effluent discharge and the United States' plan to acquire the remainder of Jaite Mill.

121.    In a March 16, 1984 letter following the meeting, Ohio EPA stated it would not enforce against TCBC, given the United States' assurance that it would purchase Jaite Mill promptly and, therefore, TCBC's ongoing wastewater effluent discharges would cease (although pre-existing contamination caused by TCBC would remain).  A copy of the letter from Jennifer Tiell (Ohio EPA) to Ernest Genovese (TCBC) dated March 16, 1984 is attached as Exhibit 3 to this Complaint.

122.    Importantly, Ohio EPA made clear its view that "***the Park Service, and the U.S. government, as owner, would then be liable for the wastewater discharge emanating from [TCBC's] operations upon assuming ownership*" of Jaite Mill**.  *Id.* (emphasis added).

123.    On September 20, 1984, exactly one (1) year after the United States asked Ohio EPA to ignore TCBC's ongoing wastewater discharge violations and resulting environmental contamination, TCBC wrote to Congressman Seiberling about the severe hardship TCBC was enduring while waiting for the United States to purchase the final Jaite Mill parcel (the plant

parcel).  In particular, TCBC cited continued wastewater effluent discharge and sulfur dioxide air emissions violations.

124.    On November 6, 1984, Ohio EPA informed TCBC that its ongoing wastewater effluent discharge violations remained at issue and TCBC was operating without a valid wastewater discharge permit.

125.    In this same letter, Ohio EPA made clear that TCBC's operations had caused an adverse impact upon the water quality of Brandywine Creek and the Cuyahoga River, and that sludge deposits, with paper fibers, were observed in the waterways.  A copy of the November 6, 1984 letter from Ohio EPA to TCBC is attached as Exhibit 4.

126.    Ohio EPA informed TCBC that it expected all non-compliant wastewater effluent discharges to cease by December 15, 1984, which was the then-expected date when the United States would purchase the plant parcel of Jaite Mill.  Ohio EPA stressed that it had been "patient with both [TCBC] and with the Department of the Interior" in deferring enforcement action against TCBC for ongoing environmental violations for years.  *Id.*

127.    TCBC's longstanding environmental violations were also well documented in water quality studies conducted by Ohio EPA.  In a 1984 water quality survey, TCBC was identified as a major "point source" of contamination to both Brandywine Creek and the Cuyahoga River.

128.    Despite its knowledge of environmental contamination at the Jaite Mill plant parcel and its knowledge that CERCLA imposes liability on current owners of contaminated property, on January 16, 1985, the United States purchased the Jaite Mill plant parcel for $4.5 million.

129.    With its purchase of the plant parcel complete, the United States, as of January

16, 1985, owned the entirety of Jaite Mill.

The United States Failed to Promptly Address
Known Environmental Contamination at Jaite Mill

130.    In contrast to its prompt response at the Krejci Dump (where the United States

conducted a thorough investigation of contamination and closed the dump to the public within a

year of acquiring the property), the United States made no swift efforts to investigate and

remediate Jaite Mill contamination.  Instead, the United States allowed public access to Jaite

Mill, a known contaminated property, for years while contamination remained unabated.

131.    Between 1985 and 1990, the United States took *no* action to investigate or

remediate the known contamination at Jaite Mill.

132.    Nor did the United States take any steps to require TCBC to address its known

contamination at Jaite Mill.

133.    Nor did the United States take any steps to restrict public access to Jaite Mill.

Instead, the United States allowed the public to use Jaite Mill for recreational purposes and to

observe the historic plant, which had been listed on the National Register of Historic Places years

prior.

134.    In 1990, the United States took an initial step to evaluate potential health risks

posed by Jaite Mill by conducting an asbestos hazard assessment.

135.    One year later, in 1991, the United States conducted a soil gas survey at Jaite

Mill.  A soil gas survey evaluates the nature and extent of volatilizing contaminated vapors in the

subsurface that may escape above ground and potentially could pose health risks.

136.    Notably, despite recognizing the presence of environmental contamination in the

subsurface (which triggered the need to conduct the soil gas survey), the United States did not

23

begin to thoroughly evaluate the nature and extent of contamination in subsurface soils or groundwater at the time the soil gas survey was conducted.

137. In October 1992, the United States was forced to change its plan to preserve Jaite Mill as a historic place, without investigating and remediating the known environmental contamination. Due to the United States' failure to adequately secure Jaite Mill, there was an arson fire that rendered Jaite Mill ineligible for continued preservation as a historic place.

138. Since Jaite Mill was then ineligible for continued preservation, the United States finally began to take steps to investigate and remediate the known contamination at Jaite Mill in earnest. However, progress was slow.

139. In 1993, *eight (8) years after purchasing Jaite Mill*, the United States conducted its first environmental site assessment at Jaite Mill, a Phase I environmental site assessment.

140. A Phase I environmental site assessment does not involve any sampling of environmental media for contamination. Rather, such an assessment involves collecting historic and current information on a property, visually evaluating potential environmental areas of concern, and interviewing individuals with knowledge of the property.

141. The following year, in 1994, the United States removed four (4) underground storage tanks at Jaite Mill that contained gasoline, fuel oil, or diesel fuel.

142. In 1997, *twelve (12) years after purchasing Jaite Mill*, the United States conducted a site assessment to evaluate residual polycyclic aromatic hydrocarbons in soil and groundwater in the vicinity of the removed underground storage tanks.

143. The United States submitted a site assessment report dated November 18, 1997 to the Ohio Bureau of Underground Storage Tank Regulations, a bureau of the Ohio Commerce Division, Department of the State Fire Marshal.

144.    In a December 24, 1997 letter, the Bureau of Underground Storage Tank Regulations informed the United States that contamination associated with the underground storage tanks had been adequately delineated, and that the United States must submit a remedial action plan to remediate that contamination.

145.    In 2003, *eighteen (18) years after purchasing Jaite Mill*, the United States performed a site inventory and conducted an initial risk assessment relating to environmental contamination at Jaite Mill.

146.    In 2004, *nineteen (19) years after purchasing Jaite Mill*, the United States finally undertook a site-wide investigation that evaluated Jaite Mill environmental media.

147.    More than 150 samples were collected from surface and subsurface soil, sediment, settling ponds, tank liquids, and groundwater at Jaite Mill.  That investigation detected a variety of hazardous substances, including volatile organic compounds ("VOCs"), semivolatile organic compounds ("SVOCs"), metals, polychlorinated biphenyls ("PCBs"), pesticides, and herbicides.

148.    The 2004 site-wide investigation found that contamination in several areas of Jaite Mill exceeded then-applicable human health or ecological screening levels.

149.    Several areas of Jaite Mill were identified as being environmental areas of concern.  These included a "dump site" at the southwestern portion of the property, settling ponds on the northeastern portion of the property, a central waste pile, a southern waste pile, and a chlorinated VOC area.  Attached as Exhibit 5 to this Complaint is Figure 3 from the United States' most recent environmental report, the Draft-Final Jaite Paper Mill Cuyahoga Valley National Park Engineering Evaluation/Cost Analysis dated August 20, 2020, identifying these areas of concern.

150. Importantly, the 2004 site-wide investigation identified that waste materials in the "dump site" portion of Jaite Mill were located approximately thirty (30) to eighty (80) feet away from the Cuyahoga River bank.

151. In 2006, *fourteen (14) years after the arson fire that rendered Jaite Mill ineligible for continued preservation and twenty-one (21) years after purchasing Jaite Mill*, the United States demolished the above-ground structures.

152. Upon information and belief, sometime after 2006, the United States decided, at least *twenty-one (21) years after purchasing Jaite Mill*, to finally restrict public access to the main plant building area by installing a fence.

153. On April 8, 2008, *twenty-three (23) years after purchasing Jaite Mill*, the United States authorized the National Park Service to undertake a CERCLA removal action known as an Engineering Evaluation/Cost Analysis ("EE/CA") at Jaite Mill (the "2008 Removal Action Memorandum"). A copy of the 2008 Removal Action Memorandum is attached as Exhibit 6 to this Complaint.

154. The United States' 2008 Removal Action Memorandum explained that, despite the known presence of extensive contamination, "most of the Site remains accessible to hikers/walks on the [adjacent] towpath trail. Even the fenced area [around the building complex] is accessible to trespassers through several holes in the fence." *Id.* at 2.

155. The United States' 2008 Removal Action Memorandum also explained that Jaite Mill had been subject to extensive flooding from the Cuyahoga River and Brandywine Creek, which could result in hazardous substances being transported across the property:

The Site is located on the natural floodplain between the Cuyahoga River and Brandywine Creek. Although the flooding frequency in this area has been altered (i.e. decreased) from its presumed approximately annual cycle by the creation of the pad for the buildings, the gradual raising of the topography by on-site disposal of solid wastes over the decades, and the regulation of the Cuyahoga River upstream, ***the Site can and does still flood during large rain events***. In July 2003, a 10 to 25-year event on the Cuyahoga River and a near 100-year event on Brandywine Creek led to nearly all of the building complex and much of the adjacent land (including ***contaminated soil and some waste piles) being inundated with water. During such events, migration and release of wastes or contaminated soils through erosion is very possible***. Additionally, given that the Site is tightly bounded by the river and the creek, one or both of the channels eventually will migrated through the Site, either gradually or suddenly, causing Site contaminants to migrate downstream.

*Id.* at 3 (emphasis added).

156.    In May 2008, the United States, through its environmental contractor, The Johnson Company, inspected Jaite Mill.

157.    During this inspection, the United States observed "exposed dump waste" on the dump site portion of Jaite Mill that abuts the Cuyahoga River, as shown in The Johnson Company's Final EE/CA Work Plan dated August 4, 2016.



Photoplate 6. Exposed Dump Site waste on Cuyahoga River bank (May 2008)

27

158.     Despite identifying exposed waste in the dump portion of Jaite Mill in May 2008, the United States took no steps to secure or remove that waste in the years following.  Instead, in November 2011, the United States simply had The Johnson Company re-inspect Jaite Mill.

<u>Due to Its Delay in Implementing the EE/CA Approved in the 2008 Removal Action Memorandum, the United States Decided to Reinvestigate Jaite Mill Entirely</u>

159.     Given the United States' considerable delay in addressing the contamination following initial investigations, by 2016, the United States decided that Jaite Mill needed to be completely reinvestigated to understand the current environmental conditions.

160.     As the United States explained in its August 4, 2016 Work Plan to actually perform the EE/CA authorized in the 2008 Removal Action Memorandum:

> Investigation results must always be viewed as representing the conditions at the time of the investigation, and historical results can rarely represent current environmental conditions or impacts.  The most recent samples were collected in 2006, and many samples were collected in 1993.  ***Therefore, they cannot be used to represent current conditions for risk assessment***.

Work Plan at 2-28 (emphasis added).

161.     In the fall of 2016, ***thirty-one (31) years after purchasing Jaite Mill and eight (8) years after the 2008 Removal Action Memorandum***, the United States actually began the EE/CA by investigating environmental media across Jaite Mill.  The United States completed the investigatory work in the fall of 2017.

162.     The EE/CA results confirmed what the United States already knew about Jaite Mill: it was contaminated with a variety of hazardous substances in multiple environmental media.

28

<u>The United States Decided to Implement a So-Called Time-Critical Removal Action</u>
<u>to Stabilize the Cuyahoga River Bank Adjacent to the Dump Site Portion of Jaite Mill</u>

163.     In March 2017, the United States installed fencing around the dump portion of Jaite Mill, a known waste disposal location, to restrict public access.

164.     On July 17, 2018, ***thirty-three (33) years after acquiring Jaite Mill***, the United States authorized the National Park Service to perform a time-critical removal action under CERCLA at Jaite Mill (the "2018 Removal Action Memorandum").  A copy of the 2018 Removal Action Memorandum is attached as Exhibit 7 to this Complaint.

165.     According to the 2018 Removal Action Memorandum, a "time-critical" response was needed to address erosion of the dump site portion of Jaite Mill that had been happening for decades, that the United States knew about since at least May 2008, and that apparently had been accelerated due to recent, excessive river flooding:

> Historically, the Cuyahoga River flowed along the western border of the Site and formed a cut bank south of the Dump site area eroding and flooding an area of relatively lower topography in the eastern portion of the Shite, shown from 1952 to 1973 in Figure 2.  ***Gradually, over several decades, this cut bank feature migrated west to the higher topographic area of the Dump site area and began eroding portions of the Dump site*** by undercutting its bank and causing releases and threatened releases of the Dump site waste into the Cuyahoga River.
>
> …
>
> During this on-Site inspection [in March 2018], the [CVNP law enforcement] officers visually observed a dramatic reduction in the Cuyahoga River bank directly adjacent to the Site, as a result of recent, excessive flooding of the River. At the time of completion of this Action Memorandum, the River bank is at, or in some locations under, the Dump site fencing.  ***In other words, during the last year since the fence was installed [around the dump site portion of Jaite Mill], approximately 12-15 feet of the River bank at the Dump site has eroded into the Cuyahoga River due to extreme weather events, such as dramatic precipitation and flooding, and changes in the River's trajectory***.

*Id.* at 7-8 (emphasis added).

29

166.     According to the 2018 Removal Action Memorandum, the rapid erosion of the river bank had resulted in releases of hazardous substances to the Cuyahoga River.

167.     The United States asserted these alleged releases of hazardous substances warranted a time-critical removal action response.

168.     The selected response action was an engineered slope stabilization of approximately 550 feet of river bank at a cost of approximately $1 million.

169.     Importantly, in selecting the time-critical removal action for the river bank, the United States relied on soil data from the dump site, rather than soil data actually collected from the river bank that was the focus of the time-critical removal action.

Paddock Incurred Necessary Response Costs In Connection
With the River Bank Time-Critical Removal Action

170.     On August 3, 2018, the United States requested, both verbally and in writing, that Paddock – and Paddock alone – perform or fund the National Park Service's river bank time-critical removal action.

171.     In response, on August 14, 2018 and again on August 24, 2018, Paddock requested access to Jaite Mill from the National Park Service to collect samples from the actual river bank that was the focus of the time-critical removal action.

172.     Paddock's rationale for requesting access to sample the river bank was straightforward: without data from the river bank, the United States lacked sufficient information to determine whether *any* removal action, let alone a time-critical removal action, was warranted.

173.     On August 29, 2018, the United States denied Paddock's request to access Jaite Mill to sample the river bank, asserting that the collection of data from the very area that was the focus of the time-critical removal action was not necessary.

30

174.    On October 19, 2018, following weeks of further discussions between the United States and Paddock, the United States agreed that Paddock could collect samples from the Jaite Mill river bank, provided that Paddock first obtain the National Park Service's approval of a Sampling and Analysis Plan ("SAP") on an expedited basis and execute the National Park Service's required Special Use Permit.

175.    On October 22, 2018, Paddock requested existing documentation from the United States to prepare the SAP, and provided its comments on the draft Special Use Permit the National Park Service had provided.

176.    On October 25, 2018, Paddock and the United States held a phone call regarding the SAP and Special Use Permit.

177.    On the phone call, the United States assured Paddock that Paddock would have access to conduct its sampling from November 3 to November 7, 2018.

178.    On October 26, 2018, Paddock provided the United States with an executed Special Use Permit, despite the United States providing a final, "take it or leave it" Special Use Permit that incorporated very few of Paddock's comments.

179.    On October 30, 2018, Paddock submitted a draft 177-page SAP to the United States for approval, and contemporaneously notified the United States that Paddock was prepared to begin its sampling fieldwork on November 3, as previously assured by the United States.

180.    On November 1, 2018, the United States provided its comments on the draft SAP. Within hours, Paddock provided a revised SAP incorporating the United States' comments.

181.    During a phone call with Paddock later that same day, the United States stated that, subject to a few additional changes, Paddock's revised SAP was acceptable, and that the United States would provide formal approval of the SAP the next day, on November 2.

182.    During this same November 1 phone call, however, the United States informed Paddock that it would not provide Paddock with access to Jaite Mill until November 5 due to flooding concerns.

183.    As a supposed alternative, the United States offered that Paddock could conduct sampling after the time-critical removal action had begun – a proposal that was illusory since Paddock would not be able to collect the desired river bank samples needed to determine whether the time-critical removal action was necessary or appropriate **after** the United States began implementing the time-critical removal action.

184.    On November 2, 2018, Paddock submitted yet another revised SAP to the United States for approval.  Once again, the United States provided comments, which Paddock incorporated into a proposed final 182-page SAP that was resubmitted to the United States that same day.

185.    Later on November 2, 2018, the United States sent Paddock a letter denying Paddock any access to collect river bank samples.  The letter explained that Paddock could collect "overbank" samples (*i.e.*, samples on the top of the river bank as opposed to from the river bank itself) after the time-critical removal action was completed.  The United States also informed Paddock that the time-critical removal action would commence three (3) days later, on November 5, 2018, despite prior assurances that Paddock would have until November 7 to conduct its sampling.

186.    The Unites States did not provide Paddock with the final executed Special Use Permit and SAP until November 6, 2018, *after* the United States said the time-critical removal action would begin.  The United States specified that it would not allow Paddock to collect samples without the United States' oversight, and requested that Paddock collect split samples for the United States to submit for separate laboratory analysis.

187.    Also on November 6, 2018, Paddock's environmental consultant visited Jaite Mill and did not observe any time-critical removal action work being performed, despite the United States' assertion that the time-critical removal action would begin on November 5.

188.    After communicating this information to the United States, the United States agreed that Paddock could access Jaite Mill on November 10 and 11, 2018 to collect the desired river bank and overbank samples.

189.    Despite the United States' new assurance that Paddock could begin sampling the river bank on November 10, 2018, when Paddock's environmental consultant arrived on November 10 to collect samples, the United States prohibited the collection of any samples that day.

190.    Paddock was able to collect some of the river bank and overbank samples outlined in the SAP on November 11, 2018; a single day did not provide enough time for Paddock to collect all of its SAP-approved samples.

191.    Paddock requested that the United States provide Paddock with access to Jaite Mill on November 12, 2018 to complete the SAP-approved sampling, but the United States refused.

192.    Instead, the United States agreed that Paddock could return to Jaite Mill on November 17 and 18, 2018 to complete the planned sampling.

193.    On November 17, 2018, Paddock collected its remaining overbank samples.

194.    On November 18, 2018, Paddock returned to Jaite Mill to collect the remaining SAP-approved river bank samples, but the United States refused to allow Paddock to do so. Instead, the United States inexplicably asserted that Paddock suddenly was now required to submit a new SAP for the United States' review and approval.

195.    On or about November 19, 2018, the United States began implementation of the engineered slope stabilization that had been selected in the 2018 Removal Action Memorandum.

196.    On November 28, 2018, Paddock provided the United States with the analytical data from Paddock's sampling program, which indicated that the United States' river bank time-critical removal action was neither necessary nor appropriate.

197.    On March 18, 2019, the United States completed a "Final Time Critical Removal Action Completion Report" for the 2018 Removal Action Memorandum work.  This United States report states that the time-critical removal action was completed on March 14, 2019.

198.    In connection with its sampling program in 2018, Paddock incurred necessary response costs, which were increased with each delay imposed by the United States.

199.    In total, Paddock incurred approximately $350,000 in response costs.  These costs were incurred consistent with the NCP and United States-approved SAP.

<u>The United States Has Selected a $45 Million Final Remedy for Jaite Mill</u>

200.    The United States first made the decision to conduct an EE/CA at Jaite Mill on March 27, 2008, as evidenced by the 2008 Removal Action Memorandum.

201.    On August 20, 2020, ***thirty-five (35) years after acquiring Jaite Mill and twelve (12) years after the 2008 Removal Action Memorandum***, the United States finally issued its Draft-Final EE/CA report for Jaite Mill.

202.    The Draft-Final EE/CA report recommended an extensive remedy, at a cost of approximately $45 million, requiring excavation and removal of contaminated soil, sediment, and waste material, removal of the concrete building foundation, and removal of historical artifacts at Jaite Mill.

203.    On December 4, 2020, the United States issued the Draft-Final EE/CA report for public comment and opened a public comment period of sixty (60) days.

204.    On February 5, 2021, Paddock submitted legal and technical comments on the Draft-Final EE/CA report.

205.    Paddock's comments explained that the United States' selected remedy for Jaite Mill was arbitrary, capricious, and failed to comply with CERCLA and the NCP for the following reasons:  (i) the proposed remedy was not a "removal action" but rather an improper "remedial action," which triggered CERCLA and NCP obligations that the United States did not satisfy; (ii) the United States incorrectly determined that Jaite Mill must be remediated to an unimpaired, pre-industrial state that is not required by applicable legal requirements; and (iii) the United States made significant technical errors in the Draft-Final EE/CA report.

206.    These technical errors included, among others, relying on insufficient data for the United States' remedy decision, incorrectly overestimating potential health risks attributable to contamination at Jaite Mill, performing an insufficient ecological risk assessment, failing to consider remedial alternatives that were more cost-effective and still protective of human health and the environment, ignoring Ohio remediation standards, and failing to address climate change and sustainability concerns associated with implementing a large-scale excavation and off-site disposal remedy.

207.    On September 29, 2021, the United States authorized the National Park Service to undertake the final $45 million remedy selected in the Draft-Final EE/CA report (the "2021 Removal Action Memorandum").  A copy of the 2021 Removal Action Memorandum is attached as Exhibit 8 to this Complaint.

208.    On October 4, 2021, the United States provided Paddock with the 2021 Removal Action Memorandum and a "responsiveness summary" that responded to – and rejected – Paddock's legal and technical arguments that the selected final remedy for Jaite Mill is arbitrary, capricious, and not in accordance with law.

<u>Paddock and the United States Have Been Unable to<br>Resolve Their Dispute Concerning Jaite Mill</u>

209.    On January 7, 2022, Paddock and the United States entered into a mutual tolling agreement of claims concerning Jaite Mill.  At the time of this tolling agreement, Paddock was in bankruptcy pursuant to chapter 11 of title 11 of the United States Bankruptcy Code.

210.    Pursuant to the parties' tolling agreement, the running of any statute of limitations period that may be applicable to claims asserted by either party are tolled from January 6, 2020 until ninety (90) days after the bankruptcy court confirmed Paddock's chapter 11 plan of reorganization.

211.    On May 26, 2022, the United States Bankruptcy Court for the District of Delaware confirmed Paddock's chapter 11 plan of reorganization.  Accordingly, the tolled period covered by the parties' tolling agreement ended on August 26, 2022.

212.    On August 22, 2022, Paddock and the United States met to discuss the environmental issues at Jaite Mill.  From Paddock's perspective, the meeting confirmed that,

absent this litigation, Paddock and the United States will not be able to resolve their dispute concerning Jaite Mill.[1]

## FIRST CAUSE OF ACTION
## FOR COST RECOVERY UNDER CERCLA

213.    All of the allegations set forth above are incorporated by reference as if set forth here in full.

214.    Jaite Mill is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

215.    There have been releases of hazardous substances at Jaite Mill, including VOCs, SVOCs, PCBs, and metals, within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

216.    Paddock has incurred, and may continue to incur, necessary response costs consistent with the NCP to address releases of hazardous substances at Jaite Mill.  At this time, Paddock has incurred necessary response costs consistent with the NCP in the approximate amount of $350,000.

217.    Paddock is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

218.    The United States is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

219.    The United States is the current owner of Jaite Mill.

---

[1]    Certain settlement confidential discussions have occurred between Paddock and the United States over approximately the last year and a half, including at the August 22, 2022 meeting.  Due to the settlement confidential nature of these discussions, Paddock intentionally is not pleading additional facts about these events.

220.    As the current owner of Jaite Mill, and pursuant to Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), the United States is liable to Paddock for Paddock's past and future necessary response costs incurred at Jaite Mill.

221.    The United States is the current operator of Jaite Mill.

222.    As the current operator of Jaite Mill, and pursuant to Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), the United States is liable to Paddock for Paddock's past and future necessary response costs incurred at Jaite Mill.

## SECOND CAUSE OF ACTION
## FOR DECLARATORY JUDGMENT

223.    All of the allegations set forth above are incorporated by reference as if set forth here in full.

224.    Pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Paddock is entitled to the entry of a declaratory judgment that the United States shall be liable for Paddock's future necessary response costs consistent with the NCP, if any, incurred at Jaite Mill, which judgment shall be binding in any subsequent action to recover further response costs from the United States.

225.    An actual controversy exists between Paddock and the United States insofar as Paddock contends, and the United States denies, that the United States is liable under CERCLA for Paddock's necessary response costs incurred and to be incurred by Paddock in connection with Jaite Mill.

226.    Pursuant to 28 U.S.C. § 2201 *et seq.*, Paddock is entitled to entry of a declaratory judgment that the United States is liable for Paddock's future necessary response costs, other costs, and damages incurred at or in connection with Jaite Mill, including but not limited to necessary response costs to address hazardous substances at Jaite Mill.

## PRAYER FOR RELIEF

**WHEREFORE**, Paddock respectfully requests:

(1)    Judgment that the United States is liable to Paddock under Section 107 of CERCLA, 42 U.S.C. § 9607(a), for all necessary response costs incurred and to be incurred by Paddock consistent with the NCP in connection with Jaite Mill;

(2)    A declaratory judgment adjudging, decreeing, and declaring that the United States must pay to Paddock all necessary response costs Paddock has incurred consistent with the NCP in connection with Jaite Mill;

(3)    A declaratory judgment adjudging, decreeing, and declaring that the United States is liable under Section 113 of CERCLA, 42 U.S.C. § 9613(g)(2), and the Declaratory Judgments Act, 28 U.S.C. § 2201 *et seq.*, for Paddock's future necessary response costs consistent with the NCP, other costs, and damages incurred at or in connection with Jaite Mill;

(3)    Interest and costs of suit, including reasonable attorneys' and experts' fees and expenses, and prejudgment interest; and

(4)    Any other, further, and different relief as the Court deems just and proper.

Dated:  September 2, 2022                    Respectfully submitted,


                                             By: s/ Kegan A. Brown
                                             Kegan A. Brown
                                             Taylor R. West (*pro hac vice* to be filed)
                                             Youlan Xiu (*pro hac vice* to be filed)
                                             LATHAM & WATKINS LLP
                                             1271 Avenue of the Americas
                                             New York, NY 10020
                                             Telephone: (212) 906-1200
                                             Facsimile: (212) 751-4864
                                             Email: kegan.brown@lw.com
                                             Email: taylor.west@lw.com
                                             Email: youlan.xiu@lw.com

                                             *Attorneys for Plaintiff*
                                             *Paddock Enterprises, LLC*