# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

PADDOCK ENTERPRISES, LLC,

      Plaintiff,

          v.

UNITED STATES OF AMERICA,

      Defendant.

Civil Action No. 5:22-cv-1558
Judge Sara Lioi

## UNITED STATES OF AMERICA'S AMENDED ANSWER, AND COUNTERCLAIMS

Defendant United States of America (hereinafter "United States" or "Defendant") states the following in response to the Amended Complaint filed by Paddock Enterprises, LLC (hereinafter "Paddock" or "Plaintiff") on December 9, 2022.  The numbered paragraphs below correspond to the allegations set forth in Plaintiff's Amended Complaint.  For clarity, the following Amended Answer includes headings reproduced from Paddock's Amended Complaint.  The inclusion of these headings should not be construed as an admission of their contents.  Any allegation not specifically admitted below is denied.

## NATURE OF THE ACTION

1.      The allegations in Paragraph 1 consist of Plaintiff's characterization of its case and are conclusions of law to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 1.

2.      Defendant admits that in 1984 and 1985 it acquired land that included the Jaite Mill Site.  The Jaite Mill Site ("Site") comprises the former Jaite Paper Mill and associated operations area and encompasses approximately 30 acres of parkland and other areas where hazardous substances from former operations may have been deposited, stored, or disposed of or otherwise come to be located.  The Site, which was a former paper mill among other operations and uses, is located within the legislative boundaries of the Cuyahoga Valley National Park off the east bank of the Cuyahoga River near its confluence with Brandywine Creek in Brecksville, Ohio.  Defendant denies the remaining allegations in Paragraph 2.

3.      Defendant denies the allegations in Paragraph 3.

4.      The allegations in Paragraph 4 characterize a letter dated September 20, 1983, from a Land Acquisition Officer of the NPS to Ohio EPA, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of

the letter, they are denied.

5.      Defendant denies the allegations in Paragraph 5.

6.      Defendant admits that the United States began investigating environmental conditions at the Site on or around 1990 and that on June 29, 2006, November 1, 2017, and December 1, 2017, the United States sent TCBC Notices of Potential Liability and Requests for Information to TCBC.  To the extent that Paragraph 6 alleges that the United States "urged Ohio EPA not to require TCBC to address the known contamination at Jaite Mill," that allegation characterizes a letter dated September 20, 1983, from a Land Acquisition Officer of the NPS to Ohio EPA, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of the letter, they are denied.

7.      Defendant admits that portions of the Site were accessible to the public and that it had general knowledge of the potential for contamination at the Site in light of TCBC's non-compliance with state and federal air and water laws, regulations, and/or permits.  Defendant denies the remaining allegations in Paragraph 7.

8.      Defendant admits that it has prepared and/or performed at least 17 environmental reports for and/or investigations of the Site since approximately 1990 and that it had general knowledge of the potential for contamination at the Site in light of TCBC's non-compliance with state and federal air and water laws, regulations, and/or permits.  Defendant denies the remaining allegations in Paragraph 8.

9.      Defendant denies the allegations in Paragraph 9.

10.      Defendant admits that the United States estimated the costs associated with a non-time critical removal action at the Site in compliance with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP") to be approximately $45

million.  Defendant denies the remaining allegations in Paragraph 10.

11.     Defendant admits that, consistent with 40 C.F.R. § 300.415(a)(2), it notified Owens-Illinois, Inc.[1] ("Owens-Illinois") by letter dated August 3, 2018, of its intent to implement a time critical removal action ("TCRA") at the Site to stabilize a portion of the river bank and sought Owens-Illinois's commitment in funding or implementing the TCRA. Defendant also admits that Paddock previously owned and operated the Site through a predecessor or predecessors, but denies that the duration of Paddock's involvement at the Site is limited to the period between 1951 and 1967.  The allegations in the second sentence of Paragraph 11 constitute conclusions of law, to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

12.     The allegations in Paragraph 12 constitute conclusions of law, to which no response is required, but to the extent that a response is required, Defendant admits only that the United States currently owns the land identified in Paragraph 2, above, and denies the remaining allegations.

13.     The allegations in Paragraph 13 characterize a document, the Plaintiff's Amended Complaint, which speaks for itself and is the best evidence of its contents.

## PARTIES

14.     Defendant admits the allegations in Paragraph 14.

15.     Defendant admits the allegations in Paragraph 15.

16.     Defendant admits the allegations in Paragraph 16.

---

[1] Paddock is the successor in interest to Owens-Illinois, Inc.  Though Paddock's Amended Complaint generally refers to "Paddock" in place of Owens-Illinois, Inc., where a specific document or event is being discussed, the United States will refer to the entity involved at the time.

## JURISDICTION AND VENUE

17.     The allegations in Paragraph 17 contain conclusions of law to which no response is required.  To the extent that a response is required, the United States admits the allegations in Paragraph 17.

18.     The allegations in Paragraph 18 constitute conclusions of law, to which no response is required, but to the extent that a response is required, Defendant does not contest this Court's jurisdiction over this action.

19.     The allegations in Paragraph 19 constitute conclusions of law, to which no response is required, but to the extent that a response is required, Defendant does not contest that venue is proper.

20.     Defendant admits that Plaintiff served the Attorney General.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 20 regarding the U.S. Environmental Protection Agency.

## STATEMENT OF FACTS[2, 3]

21.     Defendant admits that the Site is located within the CVNP and that the authorizing legislation, P.L. 93-555, is the best evidence of what Congress envisioned.

22.     Defendant admits that it had general knowledge of the potential for contamination in the Cuyahoga Valley area but lacks the information or knowledge to form a

---

[2] Defendant questions the relevance of, and therefore the propriety of, the allegations contained in paragraphs 23-58, 68-71, as they relate to the claims Paddock raises in its Amended Complaint.

[3] A significant number of allegations in Paddock's Amended Complaint, contained in paragraphs 25-29, 31-35, 38-39, 41-42, 44, 48-49, 52-58, 60, 68-69, and 71 appear to be tied to, and devised from, a single document prepared by the NPS in 1992 entitled *A Green Shrouded Miracle, The Administrative History of Cuyahoga Valley National Recreation Area, Ohio (Green Miracle)*.  In its response to those paragraphs, the United States primarily relied on *the Green Miracl*e, a document that is an agency record.

belief as to what "the United States understood" about the potential for contamination at the time it was acquiring lands for the CVNP.  Defendant denies the remaining allegations in Paragraph 22.

23.     The allegations of Paragraph 23 characterize legislation, codified at 16 U.S.C. § 460ff *et seq.*, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 16 U.S.C. § 460ff *et seq.*, they are denied.

24.     Defendant admits that the CVNP is, or nearly spans within its legislative boundary, 33,000 acres, and that portions of the CVNP extend along the Cuyahoga River.

25.     Defendant admits the allegations in Paragraph 25.

26.     Defendant admits the allegations in Paragraph 26.

27.     Defendant admits the allegations in Paragraph 27.

28.     Defendant admits the allegations in Paragraph 28.

29.     Defendant admits the allegations in Paragraph 29.

30.     Defendant admits the allegations in Paragraph 30.

31.     Defendant admits the first sentence in Paragraph 31.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 31.

32.     Defendant admits the allegations in the first and second sentences of Paragraph 32.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 32.

33.     The allegations in the first sentence of Paragraph 33 characterize proposed legislation, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of the proposed legislation, they are denied.

Defendant admits the remaining allegations in Paragraph 33.

34.     Defendant admits the allegations in Paragraph 34.

35.     Defendant admits the allegations in Paragraph 35.

36.     The allegations of Paragraph 36 characterize documents, a 1971 letter from local residents to the United States and a transcript from an April 8, 1974, Senate hearing, which speak for themselves and are the best evidence of their contents.  To the extent that the allegations are inconsistent with the language of these documents, they are denied.

37.     The allegations in Paragraph 37 characterize documents, U.S. House and Senate Reports from December 1974, which speak for themselves and are the best evidence of their contents.  To the extent that the allegations are inconsistent with the language of these documents, they are denied.

38.     Defendant admits the allegations in Paragraph 38.

39.     Defendant admits the allegations in Paragraph 39.

40.     Defendant admits the allegations in Paragraph 40.

41.     Defendant admits the allegations in Paragraph 41.

42.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 42.

43.     The allegations in Paragraph 43 characterize a document, the transcript of a February 20, 1975, hearing before the U.S. House Subcommittee of the House Committee on Appropriations, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

44.     Defendant admits that Cuyahoga Valley land prices were increasing in 1973. Defendant denies the remaining allegations in Paragraph 44.

45.     The allegations in the first sentence of Paragraph 45 characterize a section of the United States Code, 16 U.S.C. § 460ff *et seq.*, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 16 U.S.C. § 460ff *et seq.*, they are denied.  Defendant admits that the CVNP is a unit within the National Park System administered by the Secretary of the Interior through the NPS.

46.     The allegations in Paragraph 46 characterize a section of the United States Code, 16 U.S.C. § 460ff-2(b), which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 16 U.S.C. § 460ff-2(b), they are denied.

47.     Defendant admits the allegations in Paragraph 47.

48.     Defendant admits the allegations in Paragraph 48.

49.     Defendant admits the allegations of Paragraph 49.

50.     Defendant admits that it lacked an adequate acquisition plan but lacks the knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 50.

51.     The allegations in Paragraph 51 characterize a section of the United States Code, 16 U.S.C. § 460f-2(a), which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 16 U.S.C. § 460f-2(a), they are denied.

52.     Defendant admits that it submitted an acquisition schedule on December 11, 1975, and further admits that two members of Congress believed that Interior's submission was inadequate.  Defendant lacks the knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 52.

53.     Defendant admits that Superintendent Birdsell was involved in some aspects of property acquisition for the CVNP, but lacks the knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 53.

54.     Defendant admits the allegations in Paragraph 54.

55.     Defendant admits the allegations in Paragraph 55.

56.     Defendant admits the allegations in Paragraph 56.

57.     Defendant admits the allegations in Paragraph 57.

58.     Defendant admits the allegations in Paragraph 58.

59.     Defendant admits that in 1984 and 1985 it acquired land that included the Jaite Mill Site.  Defendant denies the remaining allegations in Paragraph 59.

60.     Defendant admits the allegations in Paragraph 60.

61.     Defendant admits that, in April 1985, a solicitor's opinion stated that the NPS should "take into consideration the existence of hazardous waste not only for proposed acquisitions, but on federal tracts assessed for inclusion in land protection plans" and that, under joint and several liability, "NPS could be held accountable . . . even if it only recently acquired the property" and "NPS would then have to demonstrate to the court the culpability of other parties and that damages should be apportioned accordingly."  Defendant denies the remaining allegations in Paragraph 61.

62.     Defendant admits the allegations in Paragraph 62.

63.     The allegations in Paragraph 63 characterize a section of the United States Code, 42 U.S.C. § 9607(a), which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 42 U.S.C. § 9607(a), they are denied.

64. The allegations in Paragraph 64 characterize the definition of "respond" or "response" at 42 U.S.C. § 9601(25), which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with the language of 42 U.S.C. § 9601(25), they are denied.

65. The allegations in the first sentence of Paragraph 65 characterize a section of the United States Code, 42 U.S.C. § 9601(23), which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with the language of 42 U.S.C. § 9601(23), they are denied. The allegations in the second sentence of Paragraph 65 constitute conclusions of law, to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

66. The allegations in Paragraph 66 characterize a section of the United States Code, 42 U.S.C. § 9601(24), which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with the language of 42 U.S.C. § 9601(24), they are denied.

67. The allegations in Paragraph 67 characterize sections of the United States Code and Code of Federal Regulations, which speak for themselves and are the best evidence of their contents. To the extent that the allegations are inconsistent with the language of the United States Code or the Code of Federal Regulations, they are denied.

68. Defendant admits that Congress passed P.L. 96-510 in December 1980 and P.L. 93-555 in December 1974. Defendant admits that inspectors from Ohio EPA were invited to the area in 1981 and 1983 and detected no hazardous wastes during either inspection. Defendant admits that the Krejci Site is approximately 50 acres, that the Krejci Site operated as a dump and salvage yard beginning sometime in the late 1940s to early 1950s until early to mid-1980s,

and that the United States took control of the land that made up the Krejci Site in 1985.

69.     Defendant admits that in May 1986, the NPS received information regarding the possible presence of hazardous substances at the Krejci Site that prompted state and federal environmental involvement.  Defendant admits the second sentence of Paragraph 69.

70.     Defendant admits the allegations in Paragraph 70.

71.     Defendant admits the allegations in Paragraph 71.

72.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 72.

73.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the first sentence of Paragraph 73.

74.     Defendant admits that the Heritage Conservation and Recreation Service was an agency within the Department of the Interior, and that the Jaite Mill Historic District, Brecksville, Ohio, was entered in the National Register for Historic Places on May 31, 1979, following Jaite Mill Historic District's nomination thereto.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 74.

75.     The allegations in Paragraph 75 characterize a section of the United States Code, 54 U.S.C. §§ 300101(3)-(4), which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 54 U.S.C. §§ 300101(3)-(4), they are denied.

76.     The allegations in Paragraph 76 characterize a section of the United States Code, 54 U.S.C. § 302101, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of 54 U.S.C. § 302101, they are

9

denied.

77.     The allegations in Paragraph 77 characterize a document, the National Register of Historic Places Inventory -- Nomination Form, Form No. 10-300 REV. (9 77), which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the language of the Nomination Form, Form No. 10-300 REV. (9.77), they are denied.

78.     Defendant admits the allegations in Paragraph 78.

79.     Defendant admits that the United States had general knowledge of the potential for contamination at the Site in light of TCBC's non-compliance with state and federal air and water laws, regulations, and/or permits.  Defendant denies the remaining allegations in Paragraph 79.

80.     Defendant denies the allegations in Paragraph 80.

81.     Defendant denies the allegations in Paragraph 81 insofar as the United States believes that more than two companies owned and operated the Site between 1905 and 1967. The Jaite Company established the Jaite Paper Mill at the Site in approximately 1905 and operated it as a paper mill.  In 1951 the National Container Corporation acquired The Jaite Company.  In 1953, the National Container Corporation filed articles changing the name of the Jaite Company to the National Container Corporation of Ohio and continued the Jaite Company's operations.  As alleged more fully in the Counterclaim, a de facto merger in 1956 between National Container Corporation of Ohio and Owens-Illinois Glass Company resulted in National Container Corporation of Ohio deeding real property, within which the Site is situated, to Owens-Illinois Glass Company.  In 1965, Owens-Illinois Glass Company changed its name to Owens-Illinois, Inc (Owens-Illinois).  Through the de facto merger with National Container

Corporation of Ohio, Owens-Illinois continued the business of manufacturing paper, board, box, bags, and other products at the Site. In 1967, Tecumseh Corrugated Box Corporation acquired the Site and took over Owens-Illinois's operations until 1984. Tecumseh Corrugated Box Corporation changed its name to TCBC II in 2006.

82.     Defendant admits that Paddock is the successor to the National Container Corporation but denies that Paddock is not also the successor to the Jaite Company.

83.     Defendant admits that it has general knowledge of the potential for contamination at the Site in light of TCBC's non-compliance with state and federal air and water laws, regulations, and/or permits. Defendant denies the remaining allegations in Paragraph 83.

84.     Defendant admits the allegations in Paragraph 84.

85.     Defendant admits that the July 23, 1975, TCBC Minutes of Meeting of Board of Directors refers to the "need for cash for the balance of fiscal year of 1975 and into fiscal of 1976," the "possible condemnation of the mill," and "ecological problems." Defendant lacks the knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 85.

86.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 86.

87.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 87.

88.     Defendant admits the allegations in Paragraph 88.

89.     Defendant admits that TCBC's attorney sent a letter to USEPA on January 24, 1977, regarding an application for an alternative compliance schedule for the Ohio Sulfur Dioxide Plan. Defendant denies that any negotiated schedule for compliance was "protracted."

11

90.     Defendant admits the allegations in Paragraph 90.

91.     Defendant admits the allegations in Paragraph 91.

92.     Defendant admits that a July 12, 1979, letter from TCBC's attorney to Ben Lahoski discusses acquisition, a "sulphur dioxide problem" and the practice of "open burning" and states "[a]s you know, we are meeting with Birdsell tomorrow and, of course, we will discuss this matter with him."  Defendant lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 92.

93.     Defendant admits that TCBC and USEPA executed a Consent Decree on December 8, 1980, pertaining to the Sulfur Dioxide Plan for the State of Ohio and that TCBC paid a fine.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 93.

94.     Defendant admits the allegations in Paragraph 94.

95.     Defendant denies the allegations in Paragraph 95.

96.     Defendant admits that Superintendent Birdsell was involved in some aspects of the property acquisition for the CVNP and that there was public controversy and tension regarding the acquisition of property, but lacks the knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 96.

97.     Defendant admits the allegations in the first sentence of Paragraph 97 but denies the allegations in the second sentence of Paragraph 97.

98.     Defendant lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 98.

99.     Defendant admits the allegations in Paragraph 99.

100.    Defendant admits that Ohio EPA sent a letter dated May 6, 1982, to TCBC

stating that "the plant is not in compliance with its permit."

101.    Defendant admits the allegations in Paragraph 101.

102.    The allegations in Paragraph 102 characterize a document, a December 23, 1982, letter from the CVNRA Superintendent to Ohio EPA, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

103.    Defendant admits that on December 23, 1982, it sent a letter to Ohio EPA stating that it "recently noted a very old, semi-active oil and gas well on private property adjacent to our lands.  An oily, sludge-like material is leaking from the storage tank into a small tributary which drains to the Cuyahoga River, less than 200 yards away.  The well is located on the west side of the towpath road approximately 0.3 miles south of the Tecumseh Corrigated Box Company … While the material presently leaking into the river is of concern to us, we are even more apprehensive about large spills which might occur … We believe that … shoddy maintenance will eventually lead to a complete failure of all or part of the unit.  The results could be a large oil spill directly into the river.  We would like you to investigate this situation as soon as possible."

104.    Defendant admits that the Ohio Department of Natural Resources (Ohio DNR), Division of Oil and Gas, conducted a site inspection on February 10, 1983.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 104.

105.    Defendant admits the allegations in Paragraph 105.

106.    Defendant admits that Ohio DNR conducted an inspection on March 2, 1983. The remaining allegations in Paragraph 106 characterize a document, a March 25, 1983, Notice

13

of Violation from the Ohio Department of Natural Resources, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the Notice of Violation, they are denied.

107.    Defendant admits that TCBC's violations were corrected on or before May 3, 1983.

108.    Defendant admits allegations in Paragraph 108.

109.    Defendant admits that on September 15, 1983, Ohio EPA contacted TCBC by letter and referenced a letter from May 1982 but denies that Ohio EPA notified TCBC in May 1983.

110.    Defendant admits the allegations in Paragraph 110.

111.    The allegations in Paragraph 111 characterize a document, a September 15, 1983, letter from Ohio EPA to TCBC, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

112.    The allegations in Paragraph 112 characterize a document, a September 15, 1983, letter from Ohio EPA to TCBC, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

113.    Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 113.

114.    Defendant admits that TCBC met with U.S. House of Representative John F. Seiberling.  The remaining allegations in the first sentence of Paragraph 114 characterize a document, a September 15, 1983, letter from Ohio EPA to TCBC, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.  Defendant admits that TCBC sought to have the United States purchase Jaite Mill

14

quickly.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the second sentence of Paragraph 114.

115.     Defendant admits that on or about September 19, 1983, a Land Acquisition Officer had a telephone call with a representative of Ohio EPA during which the CVNP was discussed.  Defendant lacks sufficient knowledge of information sufficient to form a belief about the truth of the remaining allegation in Paragraph 115.

116.     The allegations in Paragraph 116 characterize a letter dated September 20, 1983, from a Land Acquisition Officer of the NPS to Ohio EPA, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

117.     The allegations in Paragraph 117 characterize a document, a September 20, 1983, letter from the Department of the Interior to Ohio EPA, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

118.     Defendant admits that in 1984 and 1985 it acquired land that included the Jaite Mill Site.

119.     Defendant admits that on February 17, 1984, four deeds were "received for the record by" the County Recorder in Summit County, Ohio, and that none of the four deeded tracts included the former Jaite Paper Mill.  Defendant admits that the total cost of these parcels was $235,375.

120.     Defendant admits the allegations in Paragraph 120.

121.     The allegations in Paragraph 121 characterize a document, a March 16, 1984, letter from Ohio EPA to TCBC, which speaks for itself and is the best evidence of its contents.

15

To the extent that the allegations are inconsistent with this letter, they are denied.

122.     The allegations in Paragraph 122 characterize a document, a March 16, 1984, letter from Ohio EPA to TCBC, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with this letter, they are denied.

123.     The allegations in Paragraph 123 characterize a document, September 20, 1984, correspondence between TCBC and Congressman Seiberling, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this correspondence, they are denied.

124.     The allegations in Paragraph 124 characterize a document, a November 6, 1984, letter from Ohio EPA to TCBC's attorney, which speaks for itself is the best evidence of its contents.   To the extent that the allegations are inconsistent with this letter, they are denied.

125.     The allegations in Paragraph 125 characterize a document, a November 6, 1984, letter from Ohio EPA to TCBC's attorney, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

126.     The allegations in Paragraph 126 characterize a document, a November 6, 1984, letter from Ohio EPA to TCBC, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with this letter, they are denied.

127.     The allegations in Paragraph 127 characterize documents, Ohio EPA water quality studies and a 1984 water quality survey, that speak for themselves and are the best evidence of their contents.  To the extent that the allegations are inconsistent with these documents, they are denied.

128.     Defendant denies the allegations in Paragraph 128.

129.     The allegations in Paragraph 129 constitute conclusions of law to which no

16

response is required, and characterize a statute, 42 U.S.C. § 9601 *et seq.*, which speaks for itself and is the best evidence of its contents. However, to the extent that Paragraph 129 contains allegations to which a response is required, Defendant admits that on January 18, 1985, a deed was "received for the record by" the County Recorder in Summit County, Ohio, and that the deed included the former Jaite Paper Mill. Defendant admits that the total cost of this parcel was $4.5 million and that the United States had general knowledge of the potential for contamination at the Site in light of TCBC's non-compliance with state and federal air and water laws, regulations, and/or permits. Defendant denies the remaining allegations in Paragraph 129.

130. Defendant admits that on or around January 16, 1985, the United States had acquired the land identified in Paragraph 2.

131. Defendant denies the allegations in Paragraph 131.

132. Defendant admits the allegations in Paragraph 132 except to the extent it alleges that any contamination at the Site was "known" beyond Defendant's general knowledge of the potential for contamination at the Site in light of TCBC's non-compliance with state and federal air and water laws, regulations, and/or permits.

133. Defendant denies the allegation in Paragraph 133.

134. Defendant admits the allegation in Paragraph 134 to the extent it refers to a period between 1985 and 1990. To the extent that Paragraph 134 refers to a period after 1990, Defendant denies that it did not take any steps to restrict public access to Jaite Mill and avers that access to portions of the Site was restricted in 1997.

135. Defendant admits the allegation in Paragraph 135.

136. Defendant admits that in 1991 it conducted a soil gas survey at Jaite Mill. Defendants denies Plaintiff's characterization of what a soil and gas survey evaluates and avers

17

that the purpose of the "passive soil gas investigations at four underground storage tanks [USTs] in the CVNRA" was to "make preliminary determinations of possible leakage" from the USTs.

137.     Defendant denies the allegations in Paragraph 137.

138.     Defendant admits that an October 8, 1992, letter to the Ohio Historical Society states that "[o]n October 2, a portion of the abandoned Jaite Paper Mill was consumed by fire, possibly an act of arson," which resulted in an "emergency situation posing an extreme hazard to public health and safety," that required "collapsing the structural portion of the mill weakened by fire." Defendant denies the remaining allegations in Paragraph 138.

139.     Defendant denies the allegations in Paragraph 139.

140.     Defendant admits the allegations in Paragraph 140.

141.     The allegations in Paragraph 141 characterize a section of the Code of Federal Regulations, 40 C.F.R. § 312.20, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with 40 C.F.R. § 312.20, they are denied.

142.     Defendant admits the allegations in Paragraph 142.

143.     Defendant admits the allegations in Paragraph 143.

144.     Defendant admits the allegations in Paragraph 144.

145.     The allegations in Paragraph 145 characterize a document, a December 24, 1997, letter from the Bureau of Underground Storage Tank Regulations to the United States, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with this letter, they are denied.

146.     Defendant admits that Foster Wheeler Environmental Corporation prepared the *Jaite Mill Site Inventory Report for Cuyahoga Valley National Park* in June 2003 and that MVTechnologies, Inc. prepared a *Risk Assessment for the Former Jaite Paper Mill* in June of

2003.

147.    Defendant admits that it undertook a Site-wide investigation in 2004.  Defendant denies the remaining allegations in Paragraph 147.

148.    Defendant admits the allegations in Paragraph 148.

149.    Defendant admits the allegations in Paragraph 149.

150.    Defendant admits the allegations in Paragraph 150.

151.    Defendant admits that a 2004 Site-wide investigation identified that waste materials in the "dump site" portion of the Site were near the river bank but not necessarily thirty to eighty feet away, as alleged in Paragraph 151.

152.    Defendant admits that it demolished the above-ground structures of the former Jaite Paper Mill in 2006.

153.    Defendant denies the allegations in Paragraph 153.

154.    Defendant admits that the NPS approved a CERCLA removal action known as an Engineering Evaluation/Cost Analysis at the Site in April, 2008.  The remaining allegations in of Paragraph 154 refer to a document, the 2008 Engineering Evaluation/Cost Analysis (EE/CA) Approval Memorandum, Jaite Paper Mill Site, Cuyahoga Valley National Park, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

155.    The allegations in Paragraph 155 characterize a document, the 2008 EE/CA Approval Memorandum, Jaite Paper Mill Site, Cuyahoga Valley National Park, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

156.    The allegations in Paragraph 156 characterize a document, the 2008 EE/CA

Approval Memorandum, Jaite Paper Mill Site, Cuyahoga Valley National Park, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

157.     Defendant admits that its contractor, the Johnson Company, conducted a site visit of Jaite Mill on May 7, 2008, but denies the allegation to the extent it characterizes a site visit as an "inspection."

158.     The allegations in Paragraph 158 characterize a document, an August 4, 2016, Final EE/CA Work Plan, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

159.     Defendant admits that its contractor conducted a site visit on November 14, 2011, to "supplement observations from previous investigations and evaluate site conditions." Defendant denies the remaining allegations in Paragraph 159.

160.     Defendant admits that, following prior investigations, the United States prepared and completed the 2016 Final EE/CA Work Plan for Jaite Mill on August 5, 2016.  Defendant denies the remaining allegations in Paragraph 160.

161.     Defendant denies that there is a document called "2008 Removal Action Memorandum."  The remaining allegations in Paragraph 161 characterize a document, the 2016 Final EE/CA Work Plan, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

162.     Defendant admits that between 2016 and 2017 the United States conducted environmental field investigations associated with the EE/CA.  Defendant denies the remaining allegations in Paragraph 162.

163.     The allegations in Paragraph 163 characterize a document, the Draft-Final

EE/CA, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

164.    Defendant admits that additional fencing was installed around the dump portion of the Site in 2017.

165.    Defendant admits that the NPS authorized a Time-Critical Removal Action at the Site on July 17, 2018.  The remaining allegations in Paragraph 165 refer to a document, the July 2018 TCRA Action Memorandum, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the July 2018 TCRA Action Memorandum, they are denied.

166.    The allegations in Paragraph 166 characterize a document, the July 2018 TCRA Action Memorandum, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

167.    The allegations in Paragraph 167 characterize a document, the July 2018 TCRA Action Memorandum, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

168.    The allegations in Paragraph 168 characterize a document, the July 2018 TCRA Action Memorandum, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

169.    The allegations in Paragraph 169 characterize a document, the July 2018 TCRA Action Memorandum, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

170.    Defendant admits that it relied on sample data collected from the dump site but denies that it did not also consider sample data from the riverbank.

171.     Defendant denies the allegations in Paragraph 171.

172.     Defendant denies the allegations in Paragraph 172.

173.     Defendant admits that, by letter dated August 3, 2018, the United States sought Owens-Illinois's "commitment in funding or implementing the TCRA."

174.     Defendant admits that an Owens-Illinois's attorney requested access to the Site on August 14, 2018, and that an August 24, 2018, letter from Owens-Illinois's attorney to the United States requested "access to the Site" to perform sampling through a contractor.  To the extent that the allegations are inconsistent with this letter, they are denied.

175.     Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 175.

176.     Defendant admits that it notified Owens-Illinois's attorney by letter dated August 29, 2018, that the "data and other information collected as part of the engineering evaluation /cost analysis ("EE/CA") process to date provide NPS with sufficient information to make the TCRA determination, and NPS does not seek additional confirmation of this conclusion.  In light of NPS's findings that the current state of the Site poses an imminent threat to public health and the environment, NPS will implement the TCRA without [Owens-Illinois]'s participation at this time."  To the extent that the allegations are inconsistent with this letter, they are denied.

177.     Defendant admits that by letter dated October 19, 2018, the United States communicated to Owens-Illinois's counsel that while the "NPS's position regarding the necessity and value of a handful of grab-samples from an already thoroughly-investigated Site has not changed, in the spirit of cooperation, if [Owens-Illinois] continues to be interested in conducting this limited sampling at the Site, NPS will allow [Owens-Illinois] access to the Site to perform an NPS-approved Sampling and Analysis Plan ("SAP"), utilizing the attached template,

pursuant to a Special Use Permit, also attached, to be issued by CUVA, if NPS concludes the sampling activity will not hinder the implementation of the Site TCRA." To the extent that the allegations are inconsistent with this letter, they are denied.

178. Defendant admits that in an October 22, 2018, letter from Owens-Illinois's counsel to the United States, Owens-Illinois requested: the Engineering Evaluation/Cost Analysis Work Plan Addendum for Phase III (Sept. 12, 2017), prepared by DCR Services & Construction, Inc.; the Engineering Evaluation/Cost Analysis Work Plan (2016), prepared by The Johnson Company; and documents explaining the NPS's planned future use at the Site. The October 22, 2018, letter also stated that "[Owens-Illinois] has reviewed NPS's draft Special Use Permit (the "Permit") for the anticipated sampling and proposed a few minor changes, as reflected in the attached markup. The bulk of these changes clarify that the obligations and assumptions of liabilities set forth in the Permit are limited to the activities to be conducted under the Permit and do not extend to the Site as a whole." To the extent that the allegations are inconsistent with this letter, they are denied.

179. Defendant admits that Owens-Illinois provided comments to the Special Use Permit via email on October 22, 2018. The remaining allegations in Paragraph 179 characterize a document, Owens-Illinois' comments on the Special Use Permit, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with Owens-Illinois' comments, they are denied.

180. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 180.

181. Defendant admits the allegation in Paragraph 181.

182. Defendant admits that the United States represented that Owens-Illinois could

23

access the Site from November 3 to November 7, 2018, but denies that this communication was an "assurance."  Defendant lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 182.

183.    Defendant admits that the United States provided Owens-Illinois a final Special Use Permit on October 25, 2018, that incorporated Owens-Illinois' proposed reservation of rights.  Defendant denies the remaining allegations in Paragraph 183.

184.    Defendant admits that Owens-Illinois provided the United States with a Special Use Permit on October 26, 2018, signed by Owens-Illinois.  Defendant denies the remaining allegations in Paragraphs 184.

185.    Defendant admits that on or around October 19, 2018, the NPS informed Owens-Illinois that it would allow Owens-Illinois access to the Site to perform an NPS-approved Sampling and Analysis Plan ("SAP"), pursuant to a Special Use Permit.  Defendant admits that Owens-Illinois notified the United States by letter dated October 30, 2018, that it "already ... made arrangements for Golder and Associates, Inc. ("Golder") to mobilize to the Site on Saturday, November 3, in anticipation of NPS's approval of the SAP and receipt of a fully executed SUP," and an October 2018 document entitled "Sampling and Analysis Plan, Cuyahoga River Bank Investigation, Jaite Paper Mill Site, Cuyahoga Valley National Park, Summit County, Ohio" was submitted to the United States.  To the extent that the allegations are inconsistent with the October 30, 2018, letter and October 2018 SAP, they are denied.

186.    Defendant admits the allegations in Paragraph 186.

187.    Defendant admits the allegations in Paragraph 187.

188.    Defendant admits the allegations in Paragraph 188.

189.    Defendant admits that, by letter dated November 2, 2018, the United States

informed Owens-Illinois's counsel that Owens-Illinois would be "permitted to sample the Site once it is safe to do so and the TCRA is completed."  Defendant denies the remaining allegations in Paragraph 189.

190.     Defendant admits that Owens-Illinois submitted a revised SAP on November 2, 2018, that the United States provided comments, and that Owens-Illinois incorporated those comments and resubmitted the SAP to the United States that day.  The remaining allegations in Paragraph 190 characterize a document, the proposed-final SAP submitted by Owens-Illinois, and to the extent the allegations are inconsistent with this document, they are denied.

191.     The allegations in Paragraph 191 characterize a document, a November 2, 2018, letter from the United States to Owens-Illinois, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this letter, they are denied.

192.     Defendant denies that the United States did not have samples from the river bank that was the subject of the time-critical removal action and admits the remaining allegations in the first sentence of Paragraph 192.  Defendant admits the allegations in the second sentence of Paragraph 192 to the extent they allege that the United States granted Owens-Illinois' sampling request on the conditions that Owens-Illinois would collect samples under United States oversight and that the samples would be split between Owens-Illinois and the United States.

193.     Defendant admits that Owens-Illinois's consultant visited the Site on November 6, 2018, and did not observe any time-critical removal action being performed.  Defendant denies the remainder of the allegation and avers that work on the TCRA was occurring on November 6, 2018.

194.     Defendant admits the allegation in Paragraph 194 but denies the allegation to the extent it implies that the United States' agreement for Owens-Illinois to access the Jaite Mill Site

was made because of the information communicated to the United States noted in the first clause of the allegation or that the samples were necessary.

195.     Defendant denies the allegations in Paragraph 195.

196.     Defendant admits that Owens-Illinois was able to collect samples from five out of the twelve SAP-approved sample locations on November 11, 2018, but lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in the first sentence of Paragraph 196.  Defendant admits that it submitted split samples collected by Owens-Illinois for laboratory analysis.

197.     Defendant admits the allegations in Paragraph 197.

198.     Defendant admits the allegations in Paragraph 198.

199.     Defendant admits the allegations in first sentence of Paragraph 199.  Defendant admits that it submitted split samples collected by Owens-Illinois for laboratory analysis.

200.     Defendant denies that Owens-Illinois "returned" to Jaite Mill on November 18, 2018 "to collect samples from the remaining seven (7) SAP-approved river bank sample locations," but admits that access to the Site was requested for November 18, 2018, and that the United States refused.  Defendant admits that the remaining samples were not collected but denies that this was because the United States refused to allow Owens-Illinois to do so. Defendant denies that it "inexplicably asserted that Paddock suddenly was now required to submit a new SAP" and avers that it required Owens-Illinois to submit a SAP addendum for review and approval because the sampling Owens-Illinois proposed to conduct was not covered by the approved SAP.

201.     Defendant admits the allegations in Paragraph 201.

202.     Defendant admits that Owens-Illinois furnished analytical data to the United

States but denies that the Owens-Illinois analytical data indicated that the TCRA was not necessary, appropriate, or inconsistent with CERCLA and the NCP.

203.     Defendant admits the allegations in the first sentence of Paragraph 203.  The allegations in the second sentence of Paragraph 203 characterize a document, the Final Time Critical Removal Action Completion Report, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with this document, they are denied.

204.     Defendant denies the allegations in Paragraph 204.

205.     Defendant lacks knowledge or information on which to form a belief about the truth of the allegations in Paragraph 205.  To the extent that Paragraph 205 alleges that any of the listed costs were "necessary," those allegations constitute a conclusion of law, to which no response is required.  To the extent a response is required, Defendant denies that allegation.

206.     Defendant denies the allegations in Paragraph 206.

207.     The allegations in Paragraph 207 constitute legal conclusions to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

208.     It is unclear what Plaintiff means by "accept its CERCLA liability" and "acknowledge its liability" and therefore Defendant denies the allegations in Paragraph 208.

209.     The allegations in Paragraph 209 constitute conclusions of law to which no response is required, but to the extent a response is required, Defendant denies the allegations.

210.     Defendant admits that a document entitled "EE/CA Approval Memorandum, Jaite Paper Mill Site, Cuyahoga Valley National Park" was last signed on April 8, 2008, and documents "the decision to conduct an Engineering Evaluation/Cost Analysis (EE/CA) for the

Jaite Paper Mill Site (Site) located in Cuyahoga Valley National Park, (CUVA), Ohio."

211. Defendant admits that it prepared a report dated August 20, 2020, which was a Draft-Final EE/CA for the Site and admits that it prepared a 2008 EE/CA Approval Memorandum. Defendant denies the remaining allegations in Paragraph 211.

212. The allegations in Paragraph 212 characterize a document, the Draft-Final EE/CA, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with this document, they are denied.

213. Defendant admits that it published a Draft-Final EE/CA report on or about December 10 and 11, 2020 and that the report was made available for public comment. Defendant denies that the United States "issued" the Draft-Final EE/CA report on December 4, 2020.

214. Defendant admits the allegations in Paragraph 214.

215. The allegations in Paragraph 215 characterize a document, Paddock's Comments to the Draft-Final EE/CA, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with Paddock's Comments to the Draft-Final EE/CA, they are denied.

216. The allegations in Paragraph 216 characterize a document, Paddock's Comments to the Draft-Final EE/CA, which speaks for itself and is the best evidence of its contents. To the extent that the allegations are inconsistent with Paddock's Comments to the Draft-Final EE/CA, they are denied.

217. Defendant admits that the NPS selected the $45 million remedy through the September 29, 2021, Removal Action Memorandum.

218. The allegations in Paragraph 218 characterize documents, the 2021 Removal

Action Memorandum and a "responsiveness summary," which speak for themselves and are the best evidence of its contents.  To the extent that the allegations are inconsistent with these documents, they are denied.

219.    Defendant admits the allegations in Paragraph 219.

220.    The allegations in Paragraph 220 characterize a document, the Tolling Agreement, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations are inconsistent with the Tolling Agreement, they are denied.

221.    Defendant admits the first sentence of Paragraph 221.  Defendant avers that the tolled period ended on August 24, 2022.

222.    Defendant admits the allegations in the first sentence of Paragraph 222. Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of Paragraph 222.  Defendant admits the allegation of the first sentence of the footnote to Paragraph 222.  Defendant lacks knowledge or information sufficient to form a belief about the truth of the allegations in the second sentence of the footnote to Paragraph 222.

223.    The allegations in Paragraph 223 characterize a document, Plaintiff's Amended Complaint, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations in Paragraph 223 are inconsistent with this document, they are denied.

224.    Defendant admits the allegations in Paragraph 224.

225.    The allegations in Paragraph 225 characterize a document, the United States' Answer and Counterclaims, filed on November 18, 2022, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations in Paragraph 225 are inconsistent with this document, they are denied.

## FIRST CAUSE OF ACTION
## FOR COST RECOVERY UNDER CERCLA

226.     Defendant incorporates by reference herein all of the responses set forth above.

227.     The allegations in Paragraph 227 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits the allegations.

228.     The allegations in Paragraph 228 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits the allegations.

229.     Defendant lacks knowledge or information sufficient to form a belief about what costs Paddock has incurred.  To the extent that the allegations in Paragraph 229 allege that those costs were "necessary response costs consistent with the NCP," those allegations constitute conclusions of law to which no response is required.  To the extent that a response is required, Defendant denies the allegations.

230.     Defendant lacks knowledge or information sufficient to form a belief about what costs Paddock has incurred.  To the extent the allegations in Paragraph 230 allege that those costs were "necessary response costs consistent with the NCP," those allegations constitute conclusions of law to which no response is required.  To the extent that a response is required, Defendant denies the allegations.

231.     The allegations in Paragraph 231 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits the allegations.

232.     The allegations in Paragraph 232 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits the allegations.

233.     The allegations in Paragraph 233 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits that the United States currently owns the Site.

234.     The allegations in Paragraph 234 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits it is the current owner of the Site but denies the remaining allegations.

235.     The allegations in Paragraph 235 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

236.     The allegations in Paragraph 236 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

<strong>SECOND CAUSE OF ACTION<br>FOR DECLARATORY JUDGMENT</strong>

237.     Defendant incorporates by reference herein all of the responses set forth above.

238.     The allegations in Paragraph 238 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

239.     The allegations in Paragraph 239 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

240.     The allegations in Paragraph 240 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant denies the allegations.

<strong>THIRD CAUSE OF ACTION<br>FOR CONTRIBUTION UNDER CERCLA</strong>

241.     Defendant incorporates by reference herein all of the responses set forth above.

242.     The allegations in Paragraph 242 characterize a document, the United States' Answer and Counterclaims, filed on November 18, 2022, which speaks for itself and is the best evidence of its contents.  To the extent that the allegations in Paragraph 242 are inconsistent with this document, they are admitted.

243.     The allegations in Paragraph 243 constitute conclusions of law to which no

response is required, but to the extent that a response is required, Defendant admits the allegations.

244. The allegations in Paragraph 244 constitute conclusions of law to which no response is required, but to the extent that a response is required, Defendant admits the allegations.

245. The allegations in Paragraph 245 characterize Plaintiff's claim and Plaintiff's request for declaratory relief, to which no response is required.

## PRAYER FOR RELIEF

This section contains Paddock's request for relief, to which no response is required. To the extent a response is required, Defendant denies that Paddock is entitled to relief under CERCLA or the Declaratory Judgment Act.

## GENERAL DENIAL

All allegations not specifically admitted above are denied.

## DEFENSES

Without limiting or waiving any defenses available, Defendant hereby asserts the following defenses:

### First Defense

Plaintiff's claims are barred by the covenant not-to-sue contained in the 2018 Special Use Permit.

### Second Defense

Plaintiff's claims are barred by the indemnification provisions contained in the 2018 Special Use Permit.

### Third Defense

Plaintiff has failed to state a claim upon which relief may be granted.

### Fourth Defense

Under the facts as alleged in the Amended Complaint, Plaintiff's alleged response costs are not "necessary costs of response" under CERCLA, 42 U.S.C. § 9607(a), and are thus not recoverable.

### Fifth Defense

Under the facts as alleged in the Amended Complaint, Plaintiff's alleged response costs were not incurred "consistent with the national contingency plan," as required by CERCLA, 42 U.S.C. § 9607(a)(4)(B), and are thus not recoverable.

### Sixth Defense

Because Plaintiff's claim under section 107(a) is legally insufficient there is no case-or-controversy necessary to enter a declaratory judgement under 42 U.S.C. § 9613(g)(2).

### Seventh Defense

Because Plaintiff's claim under section 107(a) is legally insufficient, there is no case-or-controversy necessary to enter a declaratory judgement under the Declaratory Judgement Act, 28 U.S.C. § 2201 *et seq*.

### Eighth Defense

If the United States is found to be liable to Plaintiff, the United States' liability is limited to its equitable share of the necessary response costs incurred consistent with the national contingency plan. 42 U.S.C. § 9613(f).

### Ninth Defense

In an allocation of responsibility under CERCLA, Plaintiff should not recover its full share for equitable reasons, including, but not limited to, its own conduct and liability and the doctrines of unclean hands, estoppel, waiver, and or laches.

### Tenth Defense

Plaintiff has failed to mitigate, reduce, or otherwise avoid its alleged damages.

### Eleventh Defense

If the United States is found liable to Plaintiff under CERCLA, Plaintiff has no claim for joint and several liability.  The United States' liability, if any, is limited to its equitable share of the necessary costs of response incurred consistent with the National Contingency Plan. Plaintiff's recovery from the United States, if any, should be reduced in accordance with the various equitable and other factors used under 42 U.S.C. §§ 9601 *et seq.* to allocate costs and damages among parties.

### Twelfth Defense

To the extent that Plaintiff has recovered or will recover any costs from another person or entity, or from the United States under any contract, federal grant, or any statute other than CERCLA, Plaintiff is precluded by 42 U.S.C. § 9614(b) or equitable principles from receiving reimbursement for those costs from the United States under CERCLA.

## **COUNTERCLAIMS OF THE UNITED STATES OF AMERICA**

While preserving all of its defenses and expressly denying that it is liable to Paddock Enterprises, LLC ("Paddock") for any claims set forth in the Amended Complaint, the United States of America ("United States"), by and through its undersigned attorneys, asserts the following Counterclaims against Paddock pursuant to the provisions of Rule 13 of the Federal Rules of Civil Procedure and at the request and on behalf of the United States Department of the Interior, National Park Service:

### **Parties**

1.      Counterclaim Plaintiff is the United States.

2.      Counterclaim Defendant is Paddock. Paddock is a Delaware limited liability company with its headquarters in Perrysburg, Ohio.

### **Jurisdiction and Venue**

3.      This court has subject matter jurisdiction over these Counterclaims under 42 U.S.C. § 9613(b), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

4.      Venue is proper in this district under 42 U.S.C. § 9613(b) and 28 U.S.C. §1391.

### **Ownership and Operation of the Jaite Paper Mill and Site**

The Jaite Mill Site

5.      The Site is an area that contained a former paper mill and corrugated box plant, adjacent to the Cuyahoga River and Brandywine Creek, and located within the Cuyahoga Valley National Park in northeastern Ohio.

6.      The Jaite Mill was constructed at the Site in 1905 or 1906 and was in use, although not continuously, until 1984.

7.    The Jaite Mill originally produced paper bags for flour and cement with pulp produced in-house from rags and wood.

8.    The Jaite Mill eventually produced other products, such as fertilizer bags, bread sacks, rope, kraft paper, and corrugated boxes.

9.    Some paper made at the Jaite Mill was converted to multiwall bags and corrugated boxes at an on-Site converting plant that was owned and operated as part of the Jaite Mill business.

The Jaite Mills' Ownership and Operation by
The Jaite Company and National Container Corporation

10.   The Jaite Company was incorporated in Ohio in 1905.

11.   From at least 1905 or 1906 until the 1950s, the Jaite Mill and surrounding Site properties were owned and operated by The Jaite Company.

12.   By 1918, 214 employees worked at the Jaite Mill, and by the Depression years nearly 250 people were employed at the Mill.

13.   Until mid-1951, The Jaite Company was owned and managed by members of the Jaite family.

14.   While the business was owned by the Jaite family, The Jaite Company supported the development of a company town near the Jaite Mill.

  a.  The unincorporated town of Jaite included a number of company houses, a local store, a local post office, and a local railroad station.

  b.  By the 1970s, none of the buildings in Jaite had undergone major alteration, with the exception of the paper mill.

  c.  In 1979, the town was named the Jaite Mill Historic District and it was added to the National Park Service's National Register of Historic Places.

36

    d.   The buildings of the Jaite company town now serve as the Cuyahoga Valley National Park Headquarters.

15.    As alleged in Paragraphs 81 and 82 of Paddock's Amended Complaint, a Delaware corporation known as the National Container Corporation ("National Container Corporation") began operating the Jaite Mill in 1951.

    a.   In mid-1951, the Jaite family sold all or nearly all of the stock of The Jaite Company to National Container Corporation.

    b.   By the purchase and sale of its stock in mid-1951, The Jaite Company became a subsidiary of the National Container Corporation.

    c.   After National Container Corporation purchased its stock in mid-1951, The Jaite Company continued to own the Jaite Mill and the surrounding Site properties.

16.    Before it acquired The Jaite Company, the National Container Corporation was already firmly established as a major United States producer of containers made with paper, such as corrugated cardboard boxes.

17.    National Container Corporation took various steps to exercise its corporate control over the operations of the Jaite Mill between 1951 and 1956.

    a.   In August 1951, the National Container Corporation announced that an officer of one of its businesses in Wisconsin would relocate to Ohio and assume the role of resident manager of The Jaite Company.

    b.   In 1953, the National Container Corporation sought to fill other positions at the Jaite Mill by publicizing the job openings in newspaper advertising targeting the community near National Container Corporation's paper mill in Tomahawk, Wisconsin.

     c.    National Container Corporation dismantled one of the large paper production machines at the Jaite Mill and reinstalled it at National Container Corporation's paper mill in Tomahawk, Wisconsin.

     d.    In December 1953, the National Container Corporation changed the name of its Ohio-incorporated subsidiary from "The Jaite Company" to "National Container Corporation of Ohio."

     e.    After its December 1953 name change, the National Container Corporation of Ohio continued to own and operate the Jaite Mill and the surrounding Site properties.

18.    Between 1906 and 1951, The Jaite Company disposed of hazardous substances at the Jaite Mill Site.

19.    Between 1951 and 1956, the owners and operators of the Jaite Mill Site disposed of hazardous substances at the Jaite Mill Site.

<u>The Jaite Mills' Ownership and Operation by Owens-Illinois</u>

20.    In October 1956, National Container Corporation was merged into an Ohio corporation known as Owens-Illinois Glass Company.  Owens-Illinois Glass Company later renamed itself Owens-Illinois, Inc.  The company is referred to here as "Owens-Illinois" whether the relevant events discussed here occurred before or after the name change.

21.    Before the October 1956 merger, Owens-Illinois mainly produced glass containers such as bottles and jars.

22.    Owens-Illinois viewed its merger with National Container Corporation as an opportunity to diversify and integrate its business.

23.     Owens-Illinois recognized that a primary benefit of the merger with National Container Corporation was that it allowed Owens-Illinois to produce its own containerboard boxes for shipping its glass products.

24.     As a result of the October 1956 merger, National Container Corporation of Ohio became a wholly-owned subsidiary of Owens-Illinois.

25.     For a few months after it became a wholly-owned subsidiary of Owens-Illinois in October 1956, National Container Corporation of Ohio continued to own and operate the Jaite Mill and the surrounding Site properties.

26.     After the October 1956 merger, Owens-Illinois undertook a corporate reorganization to restructure the merged businesses of Owens-Illinois and National Container Corporation.

   a.  As part of its corporate reorganization, Owens-Illinois executed a plan of liquidation for National Container Corporation of Ohio between October 1956 and the end of 1956.

   b.  Between October 1956 and the end of 1956, Owens-Illinois transferred the ownership of all assets of the National Container Corporation of Ohio to Owens-Illinois.

   c.  By its transfers of the assets of National Container Corporation of Ohio in late 1956, Owens-Illinois became the owner and operator of the Jaite Mill and the surrounding Site properties.

   d.  Between October 1956 and the end of 1956, Owens-Illinois assumed all debts and liabilities of the National Container Corporation of Ohio.

     e.    By its assumptions of the debts and liabilities of National Container Corporation of Ohio in late 1956, Owens-Illinois assumed pension-related liabilities for Jaite Mill employees.

     f.    National Container Corporation of Ohio was dissolved as of December 31, 1956.

27.    As a result of Owens-Illinois' corporate reorganization, the business previously conducted through the National Container Corporation of Ohio continued to operate as a newly-formed Multiwall Bag Division of Owens-Illinois.  For example, the Jaite Mill paper and bag production business continued to operate as part of Owens-Illinois' newly-formed Multiwall Bag Division.

28.    National Container Corporation of Ohio and Owens-Illinois had common corporate leadership before, during, and after Owens-Illinois' reorganization, liquidation, and dissolution of National Container Corporation of Ohio in late 1956.

     a.    From 1949 until 1969, Hugh C. Laughlin served in various capacities as an officer of Owens-Illinois.

     b.    In late 1956, when National Container Corporation of Ohio became an Owens-Illinois subsidiary, Mr. Laughlin served as both: (i) a Director and Executive Vice President of Owens-Illinois; and (ii) the President of National Container Corporation of Ohio.

     c.    After Owens-Illinois' reorganization, liquidation, and dissolution of National Container Corporation of Ohio in late 1956, Mr. Laughlin served as the President of Owens-Illinois' newly-formed Multiwall Bag Division and also as the President of Owens-Illinois' Mill Division.

29.     National Container Corporation of Ohio and Owens-Illinois had common corporate ownership before, during, and after Owens-Illinois' reorganization, liquidation, and dissolution of National Container Corporation of Ohio in late 1956.

30.     Owens-Illinois' reorganization, liquidation, and dissolution of National Container Corporation of Ohio amounted to a *de facto* merger of National Container Corporation of Ohio into Owens-Illinois.

31.     From 1957 until 1967, Owens-Illinois owned and operated the Jaite Mill and the surrounding Site properties.

32.     Between 1957 and 1967, Owens-Illinois disposed of hazardous substances at the Jaite Mill Site.

33.     Between 1957 and 1967, Owens-Illinois gradually converted the Jaite Mill to a facility that produced lower quality products and a waste disposal location for Owens-Illinois.

34.     Between 1957 and 1967, Owens-Illinois made gradual changes to the nature of the operations at the Jaite Mill.

    a.  Before and immediately after it was acquired by Owens-Illinois, the Jaite Mill focused on the production of multiwall bag paper (at the paper mill) and the conversion of that paper into multiwall paper bags (at the bag factory).

    b.  Owens-Illinois sold the multiwall paper bags made at the Jaite Mill to unaffiliated outside customers.

    c.  In 1957, Owens-Illinois classified both the paper mill and the bag factory at the Jaite Mill as components of Owens-Illinois' Multiwall Bag Division.

      d.   After acquiring the Jaite Mill, Owens-Illinois repurposed it for the production of paper known as nesten-kraft and chip liner, which were types of containerboard used for making corrugated and solid fiber shipping boxes.

      e.   In 1958, Owens-Illinois closed the Jaite Mill's bag factory and shipped much of its machinery and equipment to Owens-Illinois' multiwall bag production facility in Valdosta, Georgia.

      f.   By 1958, Owens-Illinois had reclassified the paper mill at the Jaite Mill as a component of Owens-Illinois' Mill Division.

      g.   Unlike prior owners, Owens-Illinois used wastepaper as feedstock for the production of products it made at the Jaite Mill, including for the production of chip liner.

      h.   By 1959, Owens-Illinois was making paperboard at the Jaite Mill from corrugated waste paper generated at other Owens-Illinois facilities.

      i.   In 1965, Owens-Illinois began using a semi-chemical pulping process for the production of paperboard at the Jaite Mill.

35.     Owens-Illinois sought to increase production at the Jaite Mill while limiting its capital investments and operating costs for the Jaite Mill.

      a.   In the mid-1960s, the Jaite Mill was producing a daily average of about 65 tons of paper designed for box production.  Owens-Illinois aspired to increase production to 100 tons per day by the late 1960s.

      b.   In contrast with a number of its other mills, Owens-Illinois made no major capital improvements to the Jaite Mill.

    c.   To avoid costs of feedstock acquisition, the Jaite Mill mainly consumed corrugated waste paper generated at other Owens-Illinois facilities.

    d.   To avoid costs of off-site waste disposal, Owens-Illinois disposed of wastes from the production processes at the Jaite Mill Site.

    e.   Owens-Illinois disposed of liquid effluent from the Jaite Mill with a spray irrigation system that applied the effluent on land at the Jaite Mill Site.

    f.   Owens-Illinois disposed waste from the Jaite Mill in one or more settling ponds or lagoons at the Jaite Mill Site.

    g.   Owens-Illinois disposed of ash from the Jaite Mill's coal-fired boiler by using it as fill at the Jaite Mill Site.

<u>The Government's Antitrust Case Against Owens-Illinois and Its Sale of the Jaite Mill</u>

36.    While Owens-Illinois owned and operated the Jaite Mill, the company's plans regarding the Mill were animated by a broader set of events that prompted a declining interest in the Mill.

37.    Within months after the October 1956 merger of Owens-Illinois and National Container Corporation, the U.S. Department of Justice filed an antitrust lawsuit against Owens-Illinois, alleging that the merger was illegal and violated Section 7 of the Clayton Act.

38.    The government's complaint asked the court to order Owens-Illinois to divest itself of all former properties of the National Container Corporation on the grounds that the October 1956 merger "tended to substantially lessen competition" in the containerboard and fiber box businesses.

39.     Although Owens-Illinois expressed initial confidence that the company would prevail in the lawsuit because it was "without merit," the company settled the litigation in 1963 by entry into a consent judgment.

40.     Under the July 1963 consent judgment, Owens-Illinois was required to reduce its involvement in the boxboard and corrugated container business by divesting itself of significant portions of its boxboard and corrugated container production capacity.

41.     The July 1963 consent judgment gave Owens-Illinois five years to complete the required divesture through sales of boxboard and corrugated container production assets, until July 1968.

42.     Between 1965 and 1967, Owens-Illinois sold several of its corrugated container production plants and boxboard mills to new owners, including the Jaite Mill.

43.     Unlike its flagship assets that Owens-Illinois planned to retain and continue operating after the required divestiture, the company's Annual Reports for 1963 through 1966 never even discussed the operation of the Jaite Mill.

44.     Owens-Illinois' sale of the Jaite Mill garnered just one sentence in company's Annual Report for 1967.  It said:  "In March, 1967, a small mill at Jaite, Ohio, which produced one type of corrugating medium and lightweight chipboard, was sold."

45.     Owens-Illinois sold the Jaite Mill and the surrounding Site properties to the Tecumseh Corrugated Box Company in 1967.

Paddock and its Corporate Successor Connections
to the Past Owners and Operators of the Jaite Mill Site

46.     Paddock is an entity formed in December 2019 as the product of a "corporate modernization" of Owens-Illinois.

47.     The corporate modernization left Paddock as the successor to Owens-Illinois' environmental liabilities, like those relating to the Site, and asbestos-related liabilities.

48.     Paddock then distributed most of its assets as a dividend to O-I Glass, Inc, which is a public company with shares traded on the New York Stock Exchange.

49.     Days after the corporate modernization, Paddock filed for bankruptcy in January 2020.

50.     The United States' claims against Paddock for the Jaite Mill Site were unimpaired by the company's plan of reorganization that was confirmed by the Bankruptcy Court.

51.     Paddock is a successor to Owens-Illinois.

52.     Paddock is a successor to the National Container Corporation.

53.     Paddock is a successor to the Ohio corporation that was: (i) known as The Jaite Company from 1905 until its December 1953 name change; and (ii) known as National Container Corporation of Ohio from its December 1953 name change until its dissolution in December 1956.

54.     Paddock's predecessors owned and operated the Jaite Mill and the surrounding Site properties from at least 1951 to 1967, as alleged in Paragraphs 11, 81, and 82 of Paddock's Amended Complaint.

55.     In fact, Paddock's predecessors owned and operated the Jaite Mill and the surrounding Site properties from at least 1905 or 1906 until 1967.

The United States' Ownership of the Jaite Mill Site

56.     In 1916, when Congress established the National Park Service within the Department of the Interior, it directed that:

> The Secretary, acting through the Director of the National
> Park Service, shall promote and regulate the use of the National Park

System by means and measures that conform to the fundamental purpose of the System units, which purpose is to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

54 U.S. Code § 100101.

57.    Congress created the Cuyahoga Valley National Park

[f]or the purpose of preserving and protecting for public use and enjoyment, the historic, scenic, natural, and recreational values of the Cuyahoga River and the adjacent lands of the Cuyahoga Valley and for the purpose of providing for the maintenance of needed recreational open space necessary to the urban environment.

16 U.S.C. § 460ff.

58.    Congress further directed that the Secretary of the Interior in managing the Cuyahoga Valley National Park to "utilize the park resources in a manner which will preserve its scenic, natural, and historic setting while providing for the recreational and educational needs of the visiting public." *Id.*

59.    Congress authorized the Secretary of the Interior to "acquire lands, improvements, waters, or interests therein by donation, purchase with donated or appropriated funds, exchange or transfer" within the boundaries of the park. 16 U.S.C. § 460ff-1.

60.    In 1985, the United States finished its acquisition of the Site property, including the closed Jaite Mill, and made it part of Cuyahoga Valley National Park. The National Park Service played no role in the operations of the Jaite Mill.

61.    The National Park Service's ownership of the Site did not contribute to any release or threatened release of hazardous substances.

62.    The Site now includes the concrete foundation of the former Jaite Mill, a Fourdrinier Machine, and surrounding waste disposal areas associated with Jaite Mill activities.

63.     The National Park Service closed portions of the Site to the public after installing fencing.

**Statutory Background**

64.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), imposes liability for response costs on four categories of "[c]overed persons"—typically known as potentially responsible parties ("PRPs").

65.     The PRPs defined as covered persons in CERCLA are: (i) current owners and operators of facilities at which hazardous substances are located; (ii) past owners and operators of such facilities at the time when disposal of hazardous substances occurred; (iii) persons who arranged for the disposal or treatment of hazardous substances found at contaminated sites; and (iv) certain transporters of hazardous substances shipped to contaminated sites. 42 U.S.C. § 9607(a)(1)-(4).

66.     Section 113(f)(1) of CERCLA provides that "[a]ny person may seek contribution from any other person who is liable or potentially liable under [Section 107(a)], during or following any civil action under [Section 106] or under [Section 107]." 42 U.S.C. § 9613(f)(1).

67.     Section 113(f)(1) of CERCLA further provides that contribution claims "shall be governed by Federal law," and "[i]n resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1).

68.     The National Park Service is authorized under CERCLA and Executive Order 12580, as amended, to respond as the lead agency to a release or threatened release of hazardous substances on public lands under the jurisdiction, custody, or control of the National Park Service.

69.     Section 104(b) of CERCLA, 42 U.S.C. § 9604(b), authorizes the National Park Service to conduct investigations and other studies to characterize the nature and extent of a release or threat of release, determine if response is necessary to protect public health or welfare or the environment, and evaluate response alternatives.

70.     Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), authorizes the National Park Service to select and implement a response action when the National Park Service determines a response is necessary.

### Response Activities and Costs Incurred by the United States

71.     Pursuant to CERCLA, the United States may take "response" actions in response to the release and threatened release of hazardous substances at and from facilities, including contaminated sites. *See* 42 U.S.C. § 9604.

72.     Such response actions may include "removal" actions, including site investigations, studies to plan and direct cleanup efforts, and various activities to prevent, minimize, or mitigate damage to public health, welfare, or the environment, as well as longer-term "remedial" actions consistent with permanent remedies. *See* 42 U.S.C. § 9604; 40 C.F.R. § 300.415(b)(1).

73.     Pursuant to Section 101(25) of CERCLA, "[t]he terms "respond" or "response" means remove, removal, remedy, and remedial action, all such terms (including "removal" and "remedial action") include enforcement activities." 42 U.S.C. § 9601(25).

74.     CERCLA Section 107 provides that the United States may recover from liable persons "all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan." ("NCP") ("response costs"). 42 U.S.C. § 9607(1)-(2).

48

75. CERCLA imposes liability for response costs on certain classes of potentially responsible parties, including parties that owned or operated a facility at the time of disposal of a hazardous substance. 42 U.S.C. § 9607(a).

76. The amounts recoverable in an action under CERCLA include statutory prejudgment interest on the response costs. Such interest accrues from the later of: (i) the date that payment of a specified amount is demanded in writing; or (ii) the date of the expenditure concerned. 42 U.S.C. § 9607(a).

77. There have been releases or threats of releases of hazardous substances at the Site within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

78. The United States has incurred an estimated $8 million in unreimbursed response costs associated with the Site, and continues to incur costs.

79. The costs associated with the United States' past response activities include labor cost, travel costs, contractor costs, other miscellaneous costs, and indirect costs.

80. The United States incurred those costs conducting response action at the Site that include but are not limited to: (i) Phase I and Phase II site assessments; (ii) screening investigations; (iii) removal of underground storage tanks; (iv) supplemental site assessments; (v) site characterizations; (vi) an engineering evaluation/cost analysis investigation; (vii) a human health risk assessment; (viii) an ecological risk assessment; (ix) an engineering evaluation/cost analysis report; and (x) a time critical removal action.

81. The costs incurred by the United States are costs of "response" and "costs of removal or remedial action incurred by the United States Government" under CERCLA §§ 101(25) and 107(a)(4)(A), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(A).

49

82.     As referenced at multiple points in Paddock's Amended Complaint, in October 2018 Paddock obtained a National Park Service Special Use Permit for preparation and implementation of a Sampling and Analysis Plan for sampling fieldwork that Paddock hoped to perform at the Site.

83.     Under Paragraph 42 of its Special Use Permit, Paddock agreed to pay all costs incurred by the National Park Service and the Department of the Interior related to the Special Use Permit and the Sampling and Analysis Plan, including all costs of sampling and oversight.

84.     On August 23, 2019, the National Park Service sent Paddock a written demand for payment of a specified amount of costs that the National Park Service had incurred related to the Special Use Permit and the Sampling and Analysis Plan.

85.     As of the date of filing of these Counterclaims, Paddock has not paid any of the United States' costs associated with the Site.

### Counterclaim One: CERCLA Cost Recovery

86.     The United States incorporates by reference, as if fully rewritten herein, Paragraphs 1 through 85 of this Counterclaim.

87.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, in pertinent part: "any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of . . . shall be liable for – (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the national contingency plan."

88.     Paddock's corporate predecessors owned and operated the Site at the time of the disposal of hazardous substances, within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

89.    The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9), because it is a site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located.

90.    Paddock is liable to the United States under Section 107 of CERCLA, 42 U.S.C. § 9607, for all response costs incurred by the United States in connection with the Site.

91.    Paddock's liability to the United States includes liability for payment of statutory prejudgment interest on the United States' response costs.

**Contingent Counterclaim Two: CERCLA Contribution**

92.    The United States incorporates by reference, as if fully rewritten herein, Paragraphs 1 through 85 of this Counterclaim.

93.    Paddock's Amended Complaint alleges a claim against the United States under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), for response costs that Paddock allegedly incurred relating to the Site. If Paddock is allowed to pursue a claim against the United States for response costs that Paddock incurred, then Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), authorizes the United States to seek contribution from Paddock in this action.

94.    If the United States is found liable under CERCLA for response costs that Paddock incurred, this Court should resolve this contingent counterclaim for contribution by allocating the response costs at issue in the Amended Complaint among liable parties, including Paddock, using such equitable factors as the court determines are appropriate under Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and grant appropriate declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

**Counterclaim Three: Declaratory Judgment for Recovery of Further
Response Costs by the United States**

95.     The United States incorporates by reference, as if fully rewritten herein,

Paragraphs 1 through 85 of this Counterclaim.

96.     Paddock is liable to the United States for any unreimbursed further response costs

that the United States may incur in connection for the Site, not inconsistent with the NCP,

pursuant to Section 107(a) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(g)(2), and

the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

WHEREFORE, the United States Requests:

A)      That the Court find Paddock is a liable party under Section 107(a) of CERCLA,

42 U.S.C. § 9607(a), as a corporate successor to past owners and operators at the time of disposal

of hazardous substances at the Site and is liable to the United States for the response costs

incurred by the National Park Service related to the Site; and

B)      That the Court find Paddock liable to the United States for the response costs

incurred by the United States related to the Site, and order Paddock to reimburse the United

States for all of its unreimbursed response costs related to the Site; and

C)      That, if this Court finds the United States to be liable under Paddock's Amended

Complaint, then the Court should allocate the response costs at issue in Paddock's Amended

Complaint among liable parties, including Paddock, under Section 113(f)(1) of CERCLA, 42

U.S.C. § 9613(f)(1), and grant appropriate declaratory relief under 28 U.S.C. § 2201-2202; and

D)      That the Court enter a declaratory judgment in favor of the United States and

against Paddock for any unreimbursed further response costs the United States incurs in

connection with the Site, not inconsistent with the NCP; and

E) That the Court award the United States its attorney's fees, costs, and disbursements incurred in this action; and

F) That the Court award the United States such other relief as the Court deems appropriate.

Respectfully submitted,

Date: January 9, 2023

MICHELLE M. BAEPPLER
First Assistant United States Attorney
Northern District of Ohio

TODD KIM
Assistant Attorney General
Environment & Natural Resources Division

s/ *Zoe B. Palenik*
ZOE B. PALENIK
PHILLIP R. DUPRE
United States Department of Justice
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 307-1034 (Palenik)
Telephone: (202) 616-7501 (Dupré)
Fax: (202) 353-1156
Email: zoe.palenik@usdoj.gov
Email: phillip.r.dupre@usdoj.gov

BRENDAN F. BARKER
(IL: 6299039)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
Telephone: (216) 622-3795
Fax: (216) 522-2404
Email: Brendan.Barker@usdoj.gov

KRISTIN FURRIE
MATTHEW INDRISANO
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 202-616-6515 (Furrie)
Telephone: (202) 514-1398 (Indrisano)
Fax: (202) 514-8865
Email: Kristin.Furrie@usdoj.gov
Email: Matthew.Indrisano@usdoj.gov