# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PADDOCK ENTERPRISES, LLC, | ) | CASE NO. 5:22-cv-1558 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is defendant United States of America's motion to dismiss the amended complaint[1] pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 21 (Motion).) Plaintiff Paddock Enterprises, LLC ("Paddock") filed an opposition (Doc. No. 24 (Opposition)), and the United States filed a reply. (Doc. No. 28 (Reply).) For the reasons discussed herein, the United States' motion to dismiss is GRANTED IN PART AND DENIED IN PART.

---

[1] On September 7, 2023, Paddock filed a motion for leave to amend its complaint and answer and counterclaims. (*See* Doc. No. 36.) Paddock claims the United States did not oppose this motion so long as certain conditions were met (*see* Doc. No. 36-1, at 3), but the written communications between the parties, which Paddock claimed to attach to the motion, were not included within the filing. (*See generally* Doc. No. 36. All page number references within this memorandum opinion are to the consecutive page numbers applied to each individual document by the electronic filing system.) Additionally, Paddock failed to either: (A) attach a redline version of its new, nearly fifty page long, amended complaint to its motion; or (B) point the Court to the specific sections of the proposed second amended complaint that are new or updated. In any event, under Local Rule 7.1(d), the United States has 14 days from Paddock's filing to file an opposition brief, if it chooses to do so. Because Paddock assures the Court and the United States that "none of Paddock's proposed amendments to its [a]mended [c]omplaint relate to the Special Use Permit or Paddock's pursuit of other potentially responsible parties, which are the focus of the United States' pending partial motion to dismiss[,]" the Court will not consider the second amended complaint for the purposes of the United States' motion to dismiss. (Doc. No. 36-1, at 6; *see also id.* at 3 (recounting that one of the terms of the parties' deal was that the United States "does not need to refile its currently pending motion to dismiss[]").) If, at a later date, the Court grants Paddock's motion for leave to file a second amended complaint, and Paddock's proposed amendments do in fact materially alter this Court's analysis, any future arguments for reconsider shall be considered waived due to Paddock's representations. Given the unripe state of Paddock's motion for leave to amend, and Paddock's assurances within the same, the Court will not further address that motion in the present memorandum opinion and order and will decide the current motion to dismiss based on Paddock's first amended complaint.

## I.    BACKGROUND

Paddock initiated this action against the United States, seeking various forms of relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") related to the contamination and subsequent cleanup efforts of the Jaite Mill property located in the Cuyahoga Valley National Park ("CVNP"). (Doc. No. 1 (Complaint).)

### A.  Procedural History

Paddock filed its initial complaint on September 2, 2022. (*Id.*) In response, the United States filed an answer on November 18, 2022, which also included counterclaims against Paddock under CERCLA. (Doc. No. 15 (Answer and Counterclaims).) On December 9, 2022, Paddock filed an amended complaint, which similarly requested relief under CERCLA, but added a new cause of action for contribution. (Doc. No. 18 (Amended Complaint).) On the same day, Paddock also filed an answer to the United States' counterclaims. (Doc. No. 19 (Answer to Counterclaims).) On January 9, 2023, the United States filed the present motion to dismiss (Doc. No. 21) and an amended answer with counterclaims. (Doc. No. 22 (Amended Answer and Counterclaims).) Paddock filed an opposition to the United States' motion to dismiss (Doc. No. 24), and the United States filed a reply. (Doc. No. 28.)

### B.  CERCLA

CERCLA was enacted to "facilitate[] cleanup and remediation [actions] of contaminated lands" by "shift[ing] the financial burden of such environmental response actions to the parties responsible for releasing hazardous substances." *See ITT Indus., Inc. v. BorgWarner, Inc.*, 506 F.3d 452, 456 (6th Cir. 2007). One method of cost shifting for private parties is through a cost recovery claim under CERCLA Section 107(a), codified at 42 U.S.C. § 9607(a). *See id*. To recover under Section 107(a), a plaintiff must establish four elements: "(1) the property is a 'facility'; (2) there has been a 'release' or 'threatened release' of a hazardous substance; (3) the release has

2

caused the plaintiff to incur 'necessary costs of response' that are 'consistent' with the [National Contingency Plan]; and (4) the defendant is in one of four categories of potentially responsible parties." *Reg'l Airport Auth. v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006) (citing *Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001)).

Private parties may also receive judicial relief under CERLCA in the form of contribution. In 1986 Congress passed the Superfund Amendments and Reauthorization Act ("SARA"), which amended CERCLA and created a contribution cause of action for private parties. *See Cooper Indus., Inc. v. Aviall Servs., Inc*., 543 U.S. 157, 162–63, 125 S. Ct. 577, 160 L. Ed. 2d 548 (2004). A private party may bring a contribution claim in two factual situations. First, "any person" can seek contribution "from any other person who is liable or potentially liable" under CERCLA Section 107(a) "during or following any civil action" under that same section. CERCLA Section 113(f)(1), codified at 42 U.S.C. § 9613. Second, a party that "has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement" may also seek contribution under CERCLA. CERCLA Section 113(f)(3)(b), codified at 42 U.S.C. § 9613.

### C.  Contamination and Cleanup at Jaite Mill

In the summer of 2018, "the United States authorized the National Park Service [("NPS")] to perform a time-critical removal action under CERCLA at Jaite Mill" because the site was contaminated with "a variety of hazardous substances in multiple environmental media."[2] (Doc. No. 18 ¶¶ 163, 165.) Although Jaite Mill has been owned entirely by the United States since 1985 (*see id. ¶* 118), and reserved for public recreation during that time (*see id*. ¶ 134), Jaite Mill's

---

[2] This recitation of facts as alleged in the amended complaint is not meant to constitute findings of fact. The facts alleged in the amended complaint are taken as true simply for purposes of resolving this motion. *See Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 12 L. Ed. 2d 1030 (1964) (per curiam) (noting that "the allegations of the complaint" must be "tak[en] as true" on a motion to dismiss).

previous owners manufactured paper materials and other products on the property, which resulted in significant contamination to the property. (*See id*. ¶¶ 2, 79.) Various governmental agencies attempted to remedy the contamination during the 1970s and 80s. (*See id*. ¶¶ 79–130.) The United States and Ohio agencies never completed these remedial measures, however, because the United States purchased Jaite Mill for the CVNP and, according to Paddock, the property was largely ignored after this purchase. (*See id*. ¶¶ 131–63.)

Then, in 2018, a little over thirty years into the United States' ownership, excessive flooding of the Cuyahoga River eroded the riverbank to such an extent that a known dumpsite on Jaite Mill eroded into the Cuyahoga River (*Id*. ¶¶ 166–67.) In light of this erosion, and associated "releases of hazardous substances to the Cuyahoga River[,]" the United States found the threat to public health to be "imminent and substantial[,]" thus meriting a time-critical removal action. (*Id*. ¶¶ 167–68.)

On August 3, 2018, the United States advised Paddock ("verbally and in writing") that it must "perform or fund the United States' river bank [*sic*] time-critical removal action." (*Id*. ¶ 173.) Paddock is a successor in interest to one of Jaite Mill's previous owners, National Container Corporation, which owned Jaite Mill from 1951 until 1967. (*See id*. ¶¶ 81–82.) Believing that the United States "lacked sufficient information to determine whether *any* removal action, let alone a time-critical removal action, was warranted[,]" Paddock requested access to sample Jaite Mill themselves. (*Id*. ¶¶ 174–75 (emphasis in original).) The United States initially denied Paddock's request (*id*. ¶ 176) and the two parties continued to negotiate whether Paddock could conduct its own sampling. (*See id*.)

In October 2018, the United States changed course and agreed to grant Paddock access to Jaite Mill so long as it "first obtain[ed] the National Park Service's approval of a Sampling and

Analysis Plan ("SAP") on an expedited basis and executed the National Park Service's required Special Use Permit." (*Id*. ¶ 177.) After more negotiations (*see id*. ¶¶ 178–91), the parties executed a NPS Special Use Permit ("the Permit") with an incorporated SAP. (*Id*. ¶ 192.)

The Permit contained multiple provisions waiving or transferring the United States' liability under certain circumstances. (Doc. No. 21-2 ¶¶ 12, 35, 49.) In addition to these specific provisions, the Permit also contained a general provision, providing that Paddock "covenants not to sue and agrees not to assert any defenses, claims or causes of action against the United States . . . [for] any costs incurred . . . pursuant to this Permit." (*Id*. ¶ 51.) The Permit also contained a reservation of rights provision that Paddock "expressly reserves any and all rights, defenses, and claims that do not relate solely to the activities conducted under this Permit[.]" (*See id*. ¶ 52.)

With the successful execution of the Permit, Paddock was able to collect samples from five different locations in or near Jaite Mill. (Doc. No. 18 ¶ 196.) Paddock attempted to acquire additional samples, in accordance with the SAP, but the United States allegedly refused Paddock access after November 17, 2018. (*Id*. ¶ 200.) For all of Paddock's collected samples, the United States also collected split samples. (*See id*. ¶¶ 196, 199.) Paddock sent its samples for laboratory analysis. (*Id*.) On November 28, 2018, Paddock provided the United States with the analytical data from its sampling. (*Id*. ¶ 202.) The United States completed the time-critical removal action on March 14, 2019. (*Id*. ¶ 203.)

In September 2021, the United States authorized the NPS to begin "the final $45 million remedy" for Jaite Mill, which was detailed in an earlier government report. (*See id*. ¶ 217.) Paddock attached this report to its complaint. (*See* Doc. No. 18-8, at 2–17.) Prior to the plan's approval, Paddock submitted "legal and technical comments" on the United States' proposed course of action, which Paddock found to be "arbitrary, capricious, and fail[ing] to comply with CERCLA

and the NCP" for numerous reasons. (Doc. No. 18 ¶¶ 214–15.) Ultimately, the United States rejected Paddock's concerns and approved its plan for final remediation. (*Id*. ¶ 218.)

The parties attempted to resolve this dispute without litigation. (*Id*. ¶¶ 219–22.) Their attempts fell short and the instant action was filed shortly thereafter. (*Id*. ¶¶ 222–23.)

## II.    STANDARD OF REVIEW

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). Although this pleading standard does not require great detail, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citing authorities). In other words, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555, n.3 (criticizing the *Twombly* dissent's assertion that the pleading standard of Rule 8 "does not require, or even invite, the pleading of facts" (internal citation omitted)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). Rule 8 does not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 678–79. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*. at 679. "The court need not, however, accept unwarranted factual inferences." *Total*

*Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

When resolving a motion to dismiss pursuant to Rule 12(b)(6), a court "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Coll. Ath. Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

## III.    DISCUSSION

Paddock's amended complaint asserts three causes of action. First, Paddock seeks to recover past and future "necessary response costs" of "at least $350,000" related to cleanup efforts at Jaite Mill pursuant to CERCLA Section 107(a), codified at 42 U.S.C. § 9607(a). (Doc. No. 18 ¶¶ 229–30.) Second, Paddock seeks an entry of declaratory judgment that "the United States is liable for Paddock's future necessary response costs, other costs, and damages incurred at or in connection with Jaite Mill, including but not limited to necessary response costs to address hazardous substances at Jaite Mill." (*Id*. ¶ 240.) Third, in response to the United States' counterclaims against Paddock (*see* Doc. No. 15), Paddock asserts a contribution claim under CERCLA Section 113 against the United States. (Doc. No. 18 ¶¶ 241–45.)

The United States moves to dismiss Paddock's first two causes of actions for two related reasons.[3] First, the United States contends that some of Paddock's alleged necessary costs of response are unrecoverable under the terms of the governing Permit granted by the NPS in November 2018 (Doc. No. 21-1, at 17–23) and the remaining costs are not adequately pled as

---

[3] The United States does not challenge Paddock's third cause of action for contribution in this motion. (*See* Doc. No. 21-1, at 16.)

7

necessary costs of response. (*See id*. at 23–25.) Second, assuming that Paddock's first cause of action will be dismissed, without any remaining CERCLA Section 107(a) claim, the United States contends that Paddock's request for declaratory relief must be dismissed. (*Id*. at 25.)

### A.  Recovery of Necessary Costs of Response under CERCLA Section 107(a)

In its first cause of action, Paddock contends it incurred four different categories of necessary costs of response under CERCLA Section 107(a) related to the cleanup at Jaite Mill. (*See* Doc. No. 18 ¶¶ 226–36.) First, Paddock seeks costs for its preparation of investigatory plans and securing access to Jaite Mill.[4] (*Id*. ¶ 229.) Second, Paddock seeks costs related to its "investigation activities[.]" (*Id*.) Third, Paddock seeks costs for when it "analyze[d] and report[ed] on those activities to the United States[.]" (*Id*.) Fourth, Paddock seeks costs for its "pursu[it] [of] liable parties, including the United States, to benefit the overall cleanup effort at Jaite Mill." (*Id*.)[5] The Court will address each argument in turn, beginning with the fourth category of costs.

### 1.  Recovery of Costs for Pursuing Liable Parties

Paddock seeks to recover costs for "pursu[ing] liable parties, including the United States, to benefit the overall cleanup effort at Jaite Mill." (Doc. No. 18 ¶ 229.) The United States contends

---

[4] Although Paddock lists these two types of expenses separately, the Court will consider them together. According to the amended complaint, having an "investigation plan" (in the form of the government approved special use permit and associated SAP) was a prerequisite for gaining access to Jaite Mill. (*See* Doc. No. 18 ¶ 177 ("[T]he United States agreed that Paddock could collect samples from the Jaite Mill river bank [*sic*], provided that Paddock first obtain the National Park Service's approval of a Sampling and Analysis Plan ('SAP') . . . and execute the National Park Service's required Special Use Permit.").) Further, Paddock does not allege any costs preparing investigatory plans outside of the costs it incurred to "secure access to Jaite Mill[.]" Therefore, the only costs Paddock alleges that it incurred "preparing investigation plans" are a subset of expenses Paddock incurred to "secure access" to Jaite Mill.

[5] For all these expenses, Paddock seeks the "past and future necessary response costs [it] incurred at Jaite Mill." (*Id*. ¶ 236.) To the extent that Paddock seeks to recover *future* necessary costs of response under CERCLA Section 107(a), such recovery is barred as a matter of law. CERCLA's statutory language allows parties to recover "any other necessary costs of response *incurred* by any other person consistent with the national contingency plan[.]" CERCLA 107(a)(4)(b), codified at 42 U.S.C. § 9607(a)(4)(B) (emphasis added). Future necessary costs cannot be recovered under Section 107(a). *See, e.g., Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1021 (9th Cir. 1993) (holding that plaintiffs must "actually incur response costs before they can recover them") (internal quotation omitted); *Lozar v. Birds Eye Foods*, 678 F. Supp. 2d 589, 608 (W.D. Mich. 2009) ("CERCLA authorizes reimbursement of past response costs and declaratory relief as to future response costs.").

that these costs are not recoverable because Paddock "provides no facts supporting [its] argument[]" and these expenses are unrecoverable as a matter of law. (*See* Doc. No. 21-1, at 18.) In response, Paddock contends that these costs are recoverable and that its claim was adequately pled. (*See* Doc. No. 24, at 17–18.) The Court finds that to the extent that these costs are recoverable under CERCLA Section 107(a), Paddock failed to adequately plead any supportive factual allegations for them and, therefore, any such claim for these costs must be dismissed.

Costs incurred to identify Potentially Responsible Parties ("PRPs") may be recovered as necessary costs of response under CERCLA Section 107(a) if properly pled. The rationale for classifying these costs as necessary costs of response begins with CERCLA's statutory language. *See Key Tronic Corp. v. United States*, 511 U.S. 809, 817–18, 114 S. Ct. 1960, 128 L. Ed. 2d 797 (1994). CERCLA Section 107(a), and its associated definitions in Section 101, does not limit a party's cost recovery to just the costs they incurred for the actual cleanup; it also explicitly permits recovery for "enforcement activities thereto." *See* 42 U.S.C. § 9601(25). The phrase "enforcement activities" is not defined within CERCLA. *See id.*

In the controlling Supreme Court case on this issue, *Key Tronic*, the Court allowed cost recovery for a private party's "lawyers' work that [was] *closely tied to* the actual cleanup[.]" 511 U.S. at 820 (emphasis added). The Court held that CERCLA does not allow recovery for "litigation-related fees" (*e.g.*, "attorney's fees associated with bringing a cost recovery action" or costs incurred negotiating with governmental regulators), but the Court allowed a private party to recover for their lawyers' work that "significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs." *Id*.

Subsequent case law from outside the Sixth Circuit has reiterated *Key Tronic*'s holding that costs associated with the identification of PRPs are only recoverable if those costs are closely tied

to benefitting the actual cleanup efforts. For example, in *Castaic Lake Water Agency v. Whittaker Corp.*, 272 F. Supp. 2d 1053 (C.D. Cal. 2003), the court allowed a claim for the recovery of identification costs to advance past a motion for summary judgment despite "the fact that [the identifier] likely hired consultants to search for PRPs in the hope that it might one day sue those PRPs for contribution" because there was "evidence sufficient to establish that it has incurred some response costs 'closely tied to the actual cleanup.'" *Id.* at 1078.

District courts within the Sixth Circuit have held that when a party investigates and identifies a new source of pollution and alleges that these investigative activities were closely tied to the site's cleanup, those costs can be recoverable. *See Ford Motor Co. v. Mich. Consol. Gas Co.*, No. 08-cv-13503, 2011 WL 1743735, at *5 (E.D. Mich. May 5, 2011). In *Ford Motor Co.*, the counter-plaintiff's amended complaint, which was filed because its original complaint was partially dismissed for failing to meet the pleading standard under *Iqbal* and *Twombly* (*see id.* at *1), sought to recover costs related to identifying PRPs and their specific contributions to the polluted site. *See* No. 08–cv–13503, Doc. No. 58-3 (Amended Complaint), Ford Motor Co. v. Mich. Consol. Gas Co., (E.D. Mich.), ¶ 93 (seeking costs for "investgat[ing] and evaluat[ing] *the nature and source* of releases and the cause of contamination at the [polluted site] requiring remediation" (emphasis added)). The amended complaint further alleged that the counter-plaintiff's identification efforts bore fruit and were "closely tied to any actual cleanup of the [polluted site]" because its investigation revealed "that the [p]roposed [r]emedy fail[s] to account for ongoing contamination" caused by another's PRP's conduct and it provided this information to the relevant regulatory agency. *See id.* ¶¶ 94–95. Taken together, the counter-plaintiff's allegations of identifying a new source of pollution, recommending a remedy modification to regulators to address this pollution, and the benefits to the overall clean-up were found to be

sufficient to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). *See Ford Motor Co.*, 2011 WL 1743735, at *5.

Conversely, in *Syms v. Olin Corp.*, 408 F.3d 95 (2d Cir. 2005), the Second Circuit upheld the district court's denial of plaintiff's claim for costs related to the identification of a PRP because "the government was already aware of [the polluter's] activities, and there [was] no evidence in the record that [the identifier's] duplicative identification of [the polluter] significantly benefited the overall clean-up effort." *Id.* at 104. Other cases have denied recovery for similar reasons. *See, e.g.*, *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 92 (2d Cir. 2000) (upholding a ruling that "none of the fees [related to identifying a PRP] were recoverable as they were not closely tied to the actual cleanup of the [applicable] [p]roperty so as to constitute a necessary cost of response." (internal quotation marks omitted)); *Wilson Road Dev. Corp. v. Fronabarger Concreters, Inc.*, 209 F. Supp. 3d 1093, 1115–16 (E.D. Mo. 2016) (denying cost recovery under CERCLA 107(a) for alleged "necessary costs of response[,]" including costs identifying PRPs, because, among other things, the plaintiffs' work "was not necessary to reveal that the open and obvious owners of a Superfund site may be liable for the contamination thereon or migrating therefrom" and "none of plaintiffs' response costs were closely tied to the actual cleanup[.]" (internal quotation marks omitted)).

Here, Paddock acknowledges that under *Key Tronic* its "identification" and "pursuit" costs are only recoverable as necessary costs of response "if those pursuit efforts 'benefit[] the entire cleanup effort.'" [6] (*See* Doc. No. 24, at 17–18 (citing *Key Tronic Corp.*, 511 U.S. at 820).) Despite

---

[6] Throughout its opposition, Paddock refers to "pursuit" costs and implies that *Key Tronic* used similar language. (*See* Doc. No. 24, at 17 ("[The Court] determined that costs incurred to pursue other PRPs do constitute 'response' costs.'")) *Key Tronic* made no such statement. Instead, the Court discussed the costs for the lawyers' work "performed in *identifying* other PRP's[.]" *Key Tronic*, 511 U.S. at 820 (emphasis added). This difference may be legally significant because you cannot *pursue* a particular party until after you've *identified* that party. *See Ekotek Site PRP Comm. v. Self*, 1 F. Supp. 2d 1282, 1295 (D. Utah 1998) (denying recovery of costs associated with tracking PRPs because the expenses went "beyond mere PRP identification and therefore are not recoverable under CERCLA"). Paddock did not

this recognition, Paddock fails to allege any facts that suggest its identification or pursuit of PRPs benefited the actual cleanup effort. Paddock claims that it "pled, with supporting facts," that it incurred these costs, but it fails to point the Court to a single supportive factual allegation. (Doc. No. 24, at 17.) In its opposition, Paddock cites only two paragraphs of "supporting facts" within its amended complaint for these costs:

> 207. In addition, Paddock has incurred necessary response costs to identify and urge liable parties, including the United States and [Tecumseh Corrugated Box Company, "TCBC"], to contribute funding to the overall cost of response actions at Jaite Mill.

> 208. On multiple occasions, Paddock has urged the United States to accept its CERCLA liability for contamination at Jaite Mill. The United States has steadfastly refused to acknowledge its liability and how its decades of inaction to address contamination the United States has known about since at least 1985 has worsened the state of the contamination at Jaite Mill.

(*See id.* at 17–18 (citing Doc. No. 18 ¶¶ 207–08).)

First, Paddock's conclusory allegation that it incurred costs "identify[ing] . . . liable parties, including the United States and TCBC" (Doc. No. 18 ¶ 207) stands in direct contrast to the factual allegations elsewhere in Paddock's amended complaint. According to Paddock's amended complaint, the United States notified Paddock of the contamination at Jaite Mill *after* the United States had investigated the site (*id.* ¶¶ 160–63), initiated remedial action itself (*id.* ¶ 164), and developed a "time-critical removal action" plan. (*Id.* ¶¶ 164–69.) Thus, based on Paddock's own allegations, the United States was already aware of the contamination at Jaite Mill, a property it owned for nearly forty years, before Paddock ever "identified" the United States as a PRP.

Additionally, Paddock's amended complaint dedicates fifty-one paragraphs to discussing TCBC's contribution to the contamination of Jaite Mill and subsequent interactions with various

---

cite to a single case which supports the idea that the later chronological activity, pursuit, qualifies as a necessary cost of response. Nonetheless, to the extent that "pursuit" costs are recoverable under *Key Tronic*, Paddock has failed to allege sufficient facts as required under *Iqbal* and *Twombly*.

regulatory agencies, including the United States. (Doc. No. 18 ¶¶ 79–130.) According to these allegations, the United States' first "conversations" with TCBC were in 1976, nearly fifty years ago, for noncompliance with the Clean Air Act. (*Id.* ¶ 88.) This began a string of back-and-forth communications between TCBC and the United States, which included inspections by the United States (*id.* ¶¶ 88, 104–05, 110) and demands that TCBC pay for its pollution at Jaite Mill. (*Id.* ¶ 93.) The government's investigative activities at Jaite Mill only ceased when the United States informed the Ohio EPA that it intended to purchase Jaite Mill. (*Id.* ¶¶ 116–17.) The amended complaint states that adequate remedial measures were never completed because of this acquisition. (*Id.* ¶ 117.)

By Paddock's own allegations then, the United States not only knew about TCBC for well over forty years, but also that the environmental damage TCBC caused went unfixed. As noted above, costs for "identifying" already known PRPs are not recoverable under CERCLA Section 107(a). *See Champion Lab'ys, Inc. v. Metex Corp.*, 677 F. Supp. 2d 748, 754 (D.N.J. 2010) (denying recovery of investigative costs, in part, because a governmental regulator "had already identified [the PRP] and was taking action against it, obviating any need for [the requesting party] to 'prompt' the [government regulator] into action"); *see also Calabrese v. McHugh*, 170 F. Supp. 2d 243, 267 (D. Conn. 2001) (denying recovery of costs incurred for an expert to identify PRPs because those expenses were incurred over a year and a half after the plaintiff had filed its lawsuit against the identified PRP).

But even if Paddock did somehow "identify" the United States and/or TCBC as a PRP, Paddock has not alleged any facts that would plausibly suggest these identifications then benefitted the actual cleanup efforts at Jaite Mill. For example, unlike the counter-plaintiff in *Ford Motor Co.*, Paddock does not allege that it identified any new source of pollution from the previously

identified parties or that it brought forth any information on previously unaddressed pollution to the attention of government regulators. *See Ford Motor Co.*, 2011 WL 1743735, at *5. Nor does Paddock allege how its "urging" of these parties to accept responsibility was closely tied to benefitting the actual cleanup efforts.[7]

Contrarily, as discussed above, Paddock's own factual allegations suggest that the United States knew about the contamination at Jaite Mill, knew about TCBC's contribution to the contamination, identified Paddock as another PRP, developed at least two separate plans to address the contamination, asked Paddock to pay for or implement one of those plans (*i.e.*, the time-critical action removal completed in 2019), and then subsequently executed a removal action. Nowhere in the Paddock's amended complaint does it allege that its "identification" or "pursuit" of either the United States or TCBC benefitted the actual cleanup of Jaite Mill in any way. In total, the allegations for identification costs in this case are analogous to *Syms*, where duplicative and non-beneficial identification costs were held to be unrecoverable by the Second Circuit. *See Syms*, 408 F.4d at 104. But this case presents even more compelling grounds for dismissal of Paddock's identification costs claim at the motion to dismiss stage because there are not even any allegations that Paddock found a new PRP or a previously unaccounted for source of pollution. Further, Paddock does not allege any facts that its efforts were closely tied to, or benefitted, the actual clean up.

For these reasons, the United States' motion to dismiss is GRANTED as it relates to these expenses.

---

[7] Although not controlling, in *Ford Motor Co.*, the counter-plaintiff strengthened their claim by explicitly alleging that the incurred costs it sought under CERCLA Section 107(a) "were not incurred for litigation purposes." No. 08–CV–13503, Doc. No. 58-3 (Amended Complaint), Ford Motor Co. v. Mich. Consol. Gas Co., (E.D. Mich.), ¶ 96. Paddock did not make a similar allegation in its amended complaint.

2. **Recovery of Necessary Costs of Response Related to Securing Access to Jaite Mill, Investigation Activities, and its Associated Analysis and Reporting**

Paddock asserts that it incurred necessary costs of response for "secur[ing] access to Jaite Mill, conduct[ing] investigation activities [and] analyz[ing] and report[ing] on those activities to the United States[.]" (Doc. No. 18 ¶ 229.) The United States contends that these expenses are not recoverable under the "clear and unambiguous[]" language of the Permit. (Doc. No. 21-1, at 19.) In its opposition, Paddock contends that the Court cannot consider the Permit on the motion to dismiss, but, even if the Court did consider it, the Permit's reservation of rights provision allows Paddock to seek recovery for these expenses. (*See* Doc, No. 24, at 11, 13–14.)

Paddock did not attach the Permit to its amended complaint (*see generally* Doc. No. 18), but the United States attached the Permit to its motion to dismiss and asks the Court to consider it. (*See* Doc. No. 21-1, at 19; *see generally* Doc. No. 21-2.) The United States argues that consideration of the Permit is proper because "[the Permit] is referred to and discussed at length in Paddock's pleading." (Doc. No. 21-1, at 19; *see also* Doc. No. 28, at 4–7.)[8] Paddock does not challenge the authenticity or completeness of the Permit but argues that the Permit cannot be considered at this stage because it is "not 'central' to Paddock's CERCLA cost recovery claim[.]" (Doc. No. 24, at 12.) For the reasons stated below, the Court finds that it may consider the Permit

---

[8] In its reply, the United States asserts, for the first time, that the Permit is a "public document[.]" (Doc. No. 28, at 4.) After making this conclusory statement, the United States fails to explain its reasoning for this legally significant designation. "Public records" are another subset of documents that may be considered at the motion to dismiss stage without converting the motion to one for summary judgment. *See Bassett*, 528 F.3d at 430. This exception does not require the Court to determine if the document is central to the claim or if they are referenced to in the complaint. *See Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883–84 (6th Cir. 2023) (explaining the public records exception). The Court's own research suggests that the Permit, and other special use permits granted by the NPS, might be stored on a government database, *see* NAT'L PARK SERV., *National Park Service Research Permit and Reporting to System*, https://irma.nps.gov/RPRS/ (last visited Sept. 21, 2023), but it is not clear who can access this database or what information the database provides to public users. Regardless, the Court need not decide if the Permit is a public document because, for the reasons discussed below, the Court will consider the Permit because Paddock refers to the Permit in its complaint and the Permit is central to some of Paddock's claims. *See Bassett*, 528 F.3d at 430.

in its analysis without converting the United States' 12(b)(6) motion into one for summary judgment.

Generally, courts considering a 12(b)(6) motion must exclude "matters outside the pleadings" if the motion to dismiss is not converted to a motion for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). The Sixth Circuit, however, recognizes some exceptions to this general rule. *See Bassett*, 528 F.3d at 430. In *Bassett*, the Sixth Circuit held that when courts are reviewing a 12(b)(6) motion they "may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *See id*. (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

Although *Bassett* does not provide further guidance on when a document is "central to the claims contained" within the complaint, subsequent cases demonstrate that consideration by a district court can be permissible when an attached document informs or limits a party's legal rights. *See, e.g.*, *Clark v. Jackson*, No. 22-5553, 2023 WL 2787325, at *1 (6th Cir. Apr. 5, 2023). In *Clark*, the district court considered multiple exhibits that the defendant, an employer, attached to its 12(b)(6) motion, before granting the motion to dismiss without converting it to a motion for summary judgment. *See id*. The plaintiff, a former employee who refused to comply with the employer's COVID-19 vaccination requirements, challenged this consideration on appeal; the Sixth Circuit affirmed in relevant part. *See id*. at *2. Among the exhibits the district court considered were the defendant's "employment policy and bylaws" because the "[plaintiff's] claims centered around employment actions taken by [the defendant]." *See id*. at *2. The plaintiff's claims were primarily rooted in alleged constitutional violations and the amended complaint did not attach, or even directly reference, any of the defendant's employment policies or bylaws. *See*

16

*generally* Amended Complaint, Clark v. Jackson, No. 21-cv-303, (E.D. Tenn. Feb. 08, 2022), Doc. No. 15. Nonetheless, the Sixth Circuit held that the district court properly considered these documents. *See Clark*, 2023 WL 2787325, at *3.

Other Sixth Circuit cases have followed this commonsense approach to considering documents outside the pleadings. *See, e.g.*, *Stein v. HHGREGG*, 873 F. 3d 523, 528 (6th Cir. 2017) (considering a referenced compensation policy that was not attached to, or directly quoted in, the complaint); *Kassem v. Ocwen Loan Servicing, LLC*, 704 F. App'x 429, 432–33 (6th Cir. 2017) (considering documents transferring a security interest in a mortgage that were not attached to the complaint because "the complaint refer[red] to numerous defects" in those documents). Unsurprisingly, so have other courts within this district. *See, e.g.*, *MTD Prods. Inc. v. Am. Honda Motor Co., Inc.*, 627 F. Supp. 3d 867, 876 (N.D. Ohio 2022) (considering emails attached to the motion to dismiss because "[plaintiff] refer[red] to these emails in its complaint" and "these specific emails [were] 'central' to [plaintiff's] claims because they relate directly to [the disputed agreement]"). To hold otherwise could permit a plaintiff to evade a Rule 12(b)(6) motion by not attaching key documents. *See Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) ("Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied."), *abrogated on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

Here, Paddock discusses the Permit at length in its amended complaint. For example, Paddock provides a detailed description of why the Permit was needed (*i.e.*, to conduct sampling "to address important data gaps") (Doc. No. 18 ¶¶ 173–75), the process of acquiring the Permit and negotiating its scope (*id*. ¶¶ 173–184), the alleged failure of the United States to grant the timely access promised in the Permit (*id*. ¶¶ 185–95), the process of sample collection governed

17

by the Permit (*id*. ¶¶ 196–202), and the costs Paddock claims it incurred implementing the Permit. (*Id*. ¶¶ 204–06.) Paddock clearly referred to the Permit in its pleading.

The Permit is also central to Paddock's claims. Paddock seeks to recover expenses under CERCLA Section 107(a) for costs it "incurred to, among other things, prepare investigation plans, secure access to Jaite Mill, conduct investigation activities, and analyze and report on those activities to the United States[.]" (*See* Doc. No. 18 ¶ 205.) By Paddock's own account, the implementation of its "investigation activities" could not begin until it received permission from the United States via a special use permit. (*See id*. ¶ 177 (recounting that "the United States agreed that Paddock could collect samples from the Jaite Mill river bank [*sic*], provided that Paddock first obtain the National Park Service's approval of a Sampling and Analysis Plan ('SAP') on an expedited basis and execute the National Park Service's required Special Use Permit.").)

Ultimately, the United States allowed Paddock to conduct sampling, but only under the terms of the Permit and its incorporated SAP. (*See id*. ¶ 190 ("[The] SAP . . . set forth the locations and process for Paddock to collect and analyze the river bank [*sic*] and overbank samples.").) The Permit determined when the samples would be collected, where the samples would be collected, how the samples would be collected, and how the samples would be analyzed. More to the point, the Permit also contained numerous provisions regarding who would, or would not, be liable for these activities. (*See, e.g.*, Doc. No. 21-2 ¶¶ 51, 52.) In its amended complaint, Paddock even refers to the sampling as "SAP-approved[.]" (*See* Doc. No. 18 ¶¶ 197, 200.) This satisfies the centrality requirements for the Court's consideration on a Rule 12(b)(6) motion.

Having determined that the Permit is central to Paddock's claims and can be considered on the United States' motion to dismiss, the Court turns to whether the plain language of the Permit bars Paddock's remaining claims for incurred costs in its first cause of action.

As an initial matter, the Court must determine what law governs the interpretation of the Permit. Despite the general agreement among the parties that the Permit should be interpreted like a contract,[9] neither party suggests what contract law should be applied in this case (*e.g.*, Ohio contract law, federal common law, or the law of some other jurisdiction). The Permit itself is similarly unhelpful on this question because the Permit does not contain a choice of law provision. (*See generally* Doc. No. 21-2.) The Court is not aware of any Sixth Circuit case that has addressed this specific issue for special use permits. Generally speaking, however, contracts between government agencies and private parties are governed by federal law. *See Bituminous Cas. Corp. v. Lynn*, 503 F.2d 636, 640 (6th Cir. 1974) ("[C]ontracts of the United States are governed by federal law."). And, under federal law, "where Congress has not adopted a different standard, it is customary to apply the principles of general contract law." *Id.* In the absence of any comment by the parties or different standard provided by Congress, the Court shall interpret the Permit applying the principles of general contract law.

Under these principles, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015) (quoting 11 *Williston on Contracts* § 30:6 (4th ed. 2012)). Further, when the contract's language is clear and unambiguous, the parties' intentions, and the contract's meaning, should be derived from the document's words alone, without the assistance of extrinsic evidence. *See Davis v. Siemens Med. Sols. USA, Inc.*, 399 F. Supp. 2d 785, 792 (W.D. Ky. 2005) (applying Kentucky

---

[9] Under some circumstances, special use permits issued by federal agencies are considered a revocable license instead of a contract. *See, e.g.*, *Winterhawk Outfitters, Inc. v. United States*, No. 12-133C, 2013 WL 12158146, at *2–4 (Fed. Cl. Jan. 2, 2013) (discussing the distinction), *aff'd*, 534 F. App'x 996 (Fed. Cir. 2013). Here, however, neither party suggests that the Permit was ever revoked, nor that the Court should interpret in a manner different than contract interpretation. Thus, the Court interprets the Permit as a contract. (*See* Doc. No. 21-1, at 15; Doc. No. 24, at 14.)

law), *judgment aff'd*, 279 F. App'x 378 (6th Cir. 2008); *Progressive Rail Inc. v. CSX Transp., Inc.*, 981 F.3d 529, 532 (6th Cir. 2020) ("[W]e do not use words discovered through extrinsic evidence to contradict the direct and most reliable evidence of the meaning of a contract: the words within its four corners."). To that point, courts will construe the contract "to effectuate its spirit and purpose, giving reasonable meaning to all parts" of the contract. *Hunt Constr. Grp., Inc. v. United States*, 281 F.3d 1369, 1372 (Fed. Cir. 2002) (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). Stated slightly differently, the contract "should be read to give effect to all its provisions and to render them consistent with each other." *See Underwriters at Lloyds Subscribing to Cover Note B0753PC1308275000 v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1051 (11th Cir. 2018) (citing Restatement (Second) of Contracts § 203(a) (Am. Law Inst. 1981)).

Here, the Permit contains a number of provisions relating to waiving or transferring liability, including that

- "This Permit is granted upon the express condition that the United States, its agents and employees, shall be free from all liabilities and claims for damages and/or suits for or by any reason, arising from or related to activities conducted pursuant to this Permit, including any releases of Waste Materials (as defined in Paragraph 39 of this Permit), injury, or death to any person or property of the [Paddock], its contractors, subcontractors, agents or employees, or third parties, from any cause or causes whatsoever while in or upon the Site or any part thereof during the term of this Permit or occasioned by any use of the Site or any activity carried on by [Paddock] or its contractors or subcontractors in connection herewith, and [Paddock] hereby covenants and agrees to indemnify, defend, save and hold harmless the United States, its agents and employees, from all liabilities, charges, expenses and costs on account of or by reason of any such injuries, deaths, liabilities, claims, suits or losses however occurring, or damages arising from any acts related to this Permit." (Doc No. 21-2 ¶ 12.)

- "[Paddock] assumes liability for all activities, releases, incidents and events caused by or associated with any permitted activity, including any and all releases of Waste Materials into the environment resulting from permitted activities. [Paddock] assumes responsibility for costs, repairs, and/or restoration

to any areas damaged by such releases and/or discharges, whether those areas are within the permitted area or not." (*Id*. ¶ 35.)

- "The United States shall have no liability for any claims or causes of action in any forum regarding any activities conducted pursuant to this Permit, including but not limited to liability for claims or causes of action for property damage, bodily injury, or death caused by Permittee's use of parklands in connection with this Permit." (*Id*. ¶ 49.)

There are also two provisions within the Permit which transfer certain costs from the United States to Paddock. (*See id*. ¶¶ 27, 42.) The first relates to the cost of splitting and analyzing samples (*id*. ¶ 27), and the second relates to expenses the government incurred for Paddock to conduct its sampling, such as NPS employees overseeing the sampling. (*Id*. ¶ 42.)

Towards the end of the document, the Permit provides, most broadly, that "[Paddock] covenants not to sue and agrees not to assert any defenses, claims or causes of action in any forum against the United States with respect to any costs incurred by it or its contractors regarding any activities conducted pursuant to this Permit." (*Id*. ¶ 51.) Unlike the first three waiver paragraphs quoted above, this broad covenant is not modified by a subsequent clause. (*Compare id*. ¶ 51, *with id*. ¶¶ 12, 35, 49.)

Finally, the permit also contains a reservation of rights provision, which provides in relevant part:

> Notwithstanding [Paddock's] acceptance of the conditions set forth in this Permit, [Paddock] expressly reserves any and all rights, defenses, and claims that do not relate solely to the activities conducted under this Permit, and this Permit shall not be deemed to be a waiver of any rights, defenses, or claims that do not relate solely to the activities conducted under this Permit.

(*Id*. ¶ 52 ("reservation of rights provision").)

The plain language of the Permit prevents Paddock from suing the United States for its costs for securing access to Jaite Mill, investigating at the site, and its subsequent analysis and reporting. Through the Permit, Paddock covenanted not to sue and "agree[d] not to assert any

defenses, claims or causes of action in any forum against the United States with respect to any costs incurred by it or its contractors regarding any activities conducted pursuant to this Permit." (*Id*. ¶ 51.) The meaning of this provision is clear and unambiguous: Paddock agreed not to bring any claim *or* cause of action for *any* of the costs it incurred for the activities conducted pursuant to the Permit.

As the United States correctly points out, the only "investigative activities" Paddock discusses in its amended complaint were those conducted at Jaite Mill on November 11 and November 17. (Doc. No. 21-1, at 17–18 (citing Doc. No. 18 ¶¶ 196, 199).) According to the amended complaint, all these investigative activities were conducted pursuant to the Permit and its associated SAP. (*See, e.g.*, Doc. No. 18 ¶¶ 196, 200 (referring to the sampling locations as "SAP-approved").)

Relatedly, the only analysis and reporting Paddock alleges for these investigative activities occurred between November 11, when the first sample was taken (*id*. ¶ 196), and November 28, when the Paddock sent their data to the United States. (*Id*. ¶ 202.) These activities were also governed by the Permit and its associated SAP (*see* Doc. No. 21-2 ¶¶ 27, 33), and thus are not recoverable. (*See id*. ¶ 27 ("[Paddock] shall provide the NPS the opportunity to split all samples. All costs associated with the splitting of samples, *including analytical costs* shall be borne by Permittee." (emphasis added)).)

As to the final group of expenses, the costs that Paddock alleges it incurred to "secure access to Jaite Mill," these are limited to the creation and finalization of the SAP. (*See* Doc. No. 18 ¶ 177.) Without the SAP, which governed the activities at Jaite Mill, the Permit would be meaningless. (*See* Doc. No. 21-2 ¶ 2.) The Permit itself does not detail when Paddock can enter Jaite Mill, where it can go, or how it can physically collect samples. (*See generally id*.) This

information was contained within the incorporated SAP. (*See id.* ("The issuance of this Permit will grant [Paddock] access to conduct those activities necessary to perform the work set forth in the attached statement of work entitled [SAP] for the area of the park delineated in the SAP[.]").) Thus, the SAP was required by the Permit and any expenses creating or finalizing this document were incurred pursuant to the Permit.

The reservation of rights provision does not save Paddock's claims for any of these costs. Paddock suggests that "[b]ecause Paddock's CERCLA cost recovery claim 'do[es] not relate solely to the activities conducted under' the [Permit] on November 11 and 17, 2018, Paddock's CERCLA cost recovery claim—in its entirety—falls within the [Permit's] reservation of rights provision." (Doc. No. 24, at 16.) This interpretation of the Permit would allow Paddock to bring "claims" for "necessary costs of response" that would otherwise be barred by the Permit so long as the "claim" includes additional, noncovered, expenses. (*See id.*)

Paddock's interpretation requires the terms "claim" and "cause of action" to be interchangeable. Although "claim" can generally be used to refer to a "cause of action" colloquially,[10] provisions within the Permit suggest that "claim" has a meaning distinct from "cause of action" as used in the Permit. First, two provisions within the Permit list "claims" and "causes of action" separately, which, under the general rules of contract interpretation, requires each term to have a separate meaning. (*See* Doc. No. 21-2 ¶¶ 49, 51.) *See Tabernacle–The New Testament Church v. State Farm Fire & Cas. Co.*, 616 F. App'x 802, 808 (6th Cir. 2015) ("Courts must give effect to all words, phrases, and clauses in interpreting a contract, avoiding

---

[10] For example, in their briefing for the instant motion, both parties frequently refer to Paddock's first cause of action as a claim. (*See* Doc. No. 24, at 16; *see also* Doc. No. 28, at 4 (urging the Court to "dismiss Paddock's CERCLA claim under §107(a)(1).").)

interpretations that would render any part of the contract surplusage or nugatory."). To interpret the term otherwise would render the phrase "cause of action" useless within those provisions.

More, the phrase "causes of action" is notably missing from the Permit's reservation of rights provision, which further suggests the two phrases have distinct meanings. (*See* Doc. No. 21-2 ¶ 52 (listing only "rights, defenses, or claims").) As a final point, when the term "claims" is used as a noun, it can be defined as "a right to something[,]" such as a right to recovery for group of related expenses. *See e.g.*, MERRIAM-WEBSTER DICTIONARY ONLINE, https://www.merriam-webster.com/dictionary/claim (last visited Sept. 21, 2023). This common parlance definition is also common in legal writings. *See, e.g.*, *Phelps v. Lengyel*, 237 F. Supp. 2d 829, 838 (N.D. Ohio 2002) (discussing the three imbedded "claims" within a single cause of action). With all this in mind, the Court finds that the Permit does not define "claims" the same as "cause of action" and that, under the Permit's language, a single cause of action can contain multiple "claims."

Thus, according to the terms of the Permit, Paddock's first cause of action contains four claims, as it is defined within the Permit. First, there is a claim for incurred expenses to "secure access to Jaite Mill[.]" (Doc. No. 18 ¶ 229.) Next, Paddock has a claim for incurred expenses to "conduct investigation activities" at Jaite Mill. (*Id.*) Third, Paddock has a claim for incurred expenses to "analyze and report on those [investigative] activities to the United States[.]" (*Id.*) And, finally, Paddock has a claim for incurred costs "pursu[ing] liable parties[.]" (*Id.*) The fact that Paddock chose to bring all these claims together within a single cause of action does not side-step the Permit's covenant not to sue. Allowing such a result would effectively render multiple provisions of the Permit meaningless, including Paddock's broad covenant not to sue, because it would allow Paddock to bring a variety of claims against the United States for activities it promised

24

it would not, so long as it packaged those expenses with other, noncovered, expenses.[11] The Court finds this interpretation unreasonable and declines to adopt it. *See, e.g.*, *Waste Mgmt., Inc. v. Rice Danis Indus. Corp.*, 257 F. Supp. 2d 1076, 1083 (S.D. Ohio 2003) ("Of course, a contract must not be interpreted in a manner which leads to an absurd result.").

Beyond its interpretative arguments, Paddock also claims that the United States confirmed that it understood the expansive breath of the reservation of rights provision. (*See* Doc. No. 18 ¶¶ 179–83.) Paddock asserts that during a phone call on October 25, 2018, "the United States indicated that it understood Paddock's intent in adding the express reservation of rights provision to the [Permit], and that Paddock's express reservation of rights provision was acceptable." (*Id.* ¶ 182.) This argument is also unavailing. Even accepting Paddock's allegations as true, the Permit's clear and unambiguous language prevents the Court from considering extrinsic evidence in its analysis. *See Cogent Sols. Grp., LLC v. Hyalogic, LLC,* 712 F.3d 305, 310 (6th Cir. 2013) ("If a contract is not ambiguous, it will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.") (applying Kentucky law) (internal quotation marks omitted). *See Progressive Rail Inc.*, 981 F.3d at 532. This prohibition covers the parties' October 25, 2018 phone call. For this reason, Paddock's extrinsic evidence does not change the clear, unambiguous meaning of the reservation of rights provision.

Because the Court finds that Paddock's costs for "secur[ing] access to Jaite Mill, conduct[ing] investigation activities [and] analyz[ing] and report[ing] those activities to the United States" were incurred "pursuant to" the Permit, and that these claims are not covered under the

---

[11] Here, the "noncovered" expenses are the pursuit costs, which have been dismissed.

reservation of rights provision, these cost claims must be dismissed from Paddock's first cause of action.

Having dismissed Paddock's claims for pursuing other potentially liable parties and for securing access to Jaite Mill, investigation activities, and associated analysis and reporting, the Court grants the United States' motion to dismiss Paddock's first cause of action in its entirety.

### B. Request for Declaratory Relief

In its second cause of action, Paddock requests an "entry of a declaratory judgment that the United States is liable for Paddock's future necessary response costs, other costs, and damages incurred at or in connection with Jaite Mill, including but not limited to necessary response costs to address hazardous substances at Jaite Mill." (Doc. No. 18 ¶ 240.) Paddock contends it is entitled to this relief pursuant to CERCLA Section 113(g)(2), codified at 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201.[12] (*Id.* ¶ 238.) In its motion to dismiss, the United States contends that if the Court dismisses Paddock's first cause of action (which it has), "it must also dismiss Paddock's declaratory judgment claim." (Doc. No. 21, at 25.) In a footnote, the United States attempts to clarify this assertion, stating, "Paddock separately requests declaratory relief as to its CERCLA 113(f)(1) [contribution] claim. The United States moves to dismiss only Paddock's request for declaratory relief as it relates to Paddock's claim under CERCLA 107(a) [cost recovery]." (*Id.* at 25 n.8.) Paddock's opposition does not directly address these arguments; instead, it contends "[a]s Paddock's CERCLA cost recovery claim survives, so too does Paddock's declaratory judgment claim." (*See* Doc. No. 24, at 19.)

---

[12] To the extent that Paddock seeks to recover any costs its already incurred under this cause of action (*see* Doc. No. 18 ¶ 240), such recovery is barred as a matter of law. The plain language of this section allows for the recovery of "*further* response costs or damages[,]" not previously incurred costs. *See* 42 U.S.C. § 9613(g)(2) (emphasis added).

CERCLA Section 113(g)(2) provides that "in any such action described in [section 9607], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). Section 9613(g)(2) is titled "Actions for recovery of costs[,]" and it is immediately followed by a subsection titled "Contribution[.]" 42 U.S.C. § 9613(g)(3). Unlike the cost recovery subsection, the contribution subsection is silent on declaratory relief. *See id.*

Although the declaratory judgment language from the "recovery of costs" subsection is absent in the contribution subsection, the Sixth Circuit requires the two claims "be treated alike." *GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 451 (6th Cir. 2004). In *GenCorp*, the court held that the two subsections "'work in conjunction' with the liability provisions of § 107(a), as 'parties seeking contribution' must turn to '§ 107 to establish the basis and elements of liability of the defendants.'" *Id.* (quoting *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 350 (6th Cir. 1998)). Thus, although Paddock's first cause of action has been dismissed, its unchallenged third cause of action for contribution under CERCLA Section 113(f)(1) is sufficient on its own to maintain a cause of action for declaratory judgment under CERCLA Section 113(g)(2). *See, e.g.*, *Hobart Corp. v. Dayton Power & Light Co.*, No. 3:13-cv-115, 2017 WL 6335911, at *3–4 (S.D. Ohio Dec. 11, 2017) (citing to *GenCorp* and refusing "to stay the issuance of a declaratory judgment concerning their liability for future response costs incurred" for a CERCLA contribution claim).

For the foregoing reasons, the United States' motion to dismiss is denied to the extent that it requested the dismissal of Paddock's second cause of action.

IV.     **CONCLUSION**

For the reasons set forth herein, the United States motion to dismiss is GRANTED IN PART AND DENIED IN PART. Paddock's first cause of action (recovery of costs under CERCLA Section 107(a)) is dismissed. This case will proceed with Paddock's second cause of action (declaratory judgment under CERCLA Section 113(g)(2)) and Paddock's third cause of action (contribution against the United States under CERCLA Section 113(f)(1)). Additionally, all three of the United States' counterclaims against Paddock remain.

**IT IS SO ORDERED**.

Dated: September 21, 2023

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**