UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PADDOCK ENTERPRISES, LLC, | ) | CASE NO. 5:22-cv-1558 |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | **ORDER ADOPTING CONSENT** |
| | ) | **DECREE** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

Paddock Enterprises, LLC ("Paddock") and the United States of America ("United States") seek relief under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") related to contamination and subsequent cleanup efforts at the Jaite Mill property ("Jaite Mill") located in the Cuyahoga Valley National Park. (*See* Doc. No. 42 (Second Amended Complaint); Doc. No. 44 (Second Amended Answer and Counterclaims).) After years of litigation and extensive settlement negotiations, the parties lodged a proposed consent decree resolving their claims. (Doc. No. 120-1 (Proposed Consent Decree).) The United States now asks the Court to adopt and enter that consent decree. (Doc. No. 122 (Motion); Doc. No 122-1 (Brief in Support).) Neither Paddock nor any third parties objected. For the reasons discussed below, the Court finds that the proposed consent decree is fair, reasonable, and consistent with CERCLA's goals.

I.  **BACKGROUND**

From 1906 to 1984, Jaite Mill was home to a paper mill. (Doc. No. 122-1, at 4.)[1] For nearly eight decades, Jaite Mill's various owners—some of which are allegedly Paddock's corporate predecessors—manufactured paper materials and other products that created significant pollution and contamination in and around the property. (*Id.*) Between 1984 and 1985, the United States purchased Jaite Mill and made it a part of the Cuyahoga Valley National Park. (*Id.*) Although all paper manufacturing operations ceased, significant pollution remains. (*Id.*)

Two cleanup efforts have been conducted at Jaite Mill in recent years. (*Id.* at 5–6.) The first action, completed in 2019 at a cost of around $1.3 million, was a time-critical action that addressed riverbank erosion to prevent the release of hazardous substances into the Cuyahoga River. (*See, e.g.*, *id.*; Doc. No. 79-3 (2018 Time Critical Removal Action Memorandum); Doc. No. 79-4 (2018 Time Critical Removal Action Completion Report).) The second action, approved in 2021 but not yet completed, calls for the full removal of contaminated soil, sediment, and waste material, removal of the concrete building foundation and the underlying contaminated soil and waste, and off-site disposal at a cost of about $45 million. (*See, e.g.*, Doc. No. 122-1, at 5; Doc. No. 120-3 (Engineering Evaluation/Cost Analysis Report), at 22; Doc. No. 120-4 (2021 Non-Time Critical Removal Action Memorandum).)

In this lawsuit, each party claims that the other should bear some of those costs under CERCLA. That statute was enacted to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for [] contamination." *Hobart Corp. v. Waste Mgmt. of Ohio, Inc.*, 758 F.3d 757, 761 (6th Cir. 2014) (citations and quotation marks omitted). CERCLA "creates a complicated network of cost-shifting

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

2

provisions, which apply depending upon who pays what and why." *Id.* at 762. If the government (or a private party) remedies contamination, it may recoup its costs from certain responsible parties, including the present and former owners of a site under CERCLA § 107(a). *See* 42 U.S.C. § 9607(a); *United States v. Atl. Research Corp.*, 551 U.S. 128, 131, 127 S. Ct. 2331, 168 L. Ed. 2d 28 (2007). "In turn, any party sued under [§ 107], by the government or a private party, may seek contribution from other [potentially responsible parties] under § 113(f)(1), so that the recovery costs can be distributed in an equitable fashion." *Hobart Corp.*, 758 F.3d at 762 (footnote omitted); *see* 42 U.S.C. § 9613(f)(1).

This case concerns both types of claims. The United States alleges that Paddock, as a corporate successor of two of Jaite Mill's previous owners, is responsible under § 107(a) for past unreimbursed costs and future response costs associated with the cleanup efforts. (Doc. No. 44, at 51–52; Doc. No. 81-1, at 20–29.) For its part, Paddock denies that it is a successor to one of the prior owners (Doc. No. 97, at 23–28), disputes whether hazardous substances were disposed at the site during its predecessors' ownership (*id.* at 21–22), and argues that the United States' selected remedies are arbitrary and capricious and not in accordance with the law. (Doc. No. 83-1, at 19–33.) Paddock also alleges that the United States is responsible for contribution under § 113(f)(1) for past and future costs as the current owner of the Jaite Mill site. (Doc. No. 42 ¶¶ 238–53.)

The parties litigated their claims over two years. They engaged in Rule 12 motion practice (*see* Doc. Nos. 21, 24, and 28), conducted expansive discovery (*see* Doc. No. 122-1, at 7), and cross-moved for summary judgment. (*See* Doc. Nos. 81, 83, 96, 97, 112, and 116.) The parties participated in extensive settlement efforts, including in-person and follow-up mediations before a private neutral, a magistrate judge, and a district judge. (*See* Minutes of proceedings [non document], filed 9/22/2023; Doc. No. 63.)

After the settlement effort before the district judge and further follow-up negotiations early this year (Doc. No. 85; Minutes of proceedings [non-document], filed 1/15/2025), the parties settled their claims and lodged a proposed consent decree with the Court. (Doc. No. 120-1.) Under the proposed consent decree, Paddock will pay $33 million to settle its potential liability. (*Id.* at 7–8.) Almost all of those funds will be used to "conduct or finance response actions at or in connection with [Jaite Mill.]" (*Id.* at 8.) The balance will be used for the "restoration, replacement, rehabilitation, and/or acquisition of the equivalent of [natural resources] and their services injured or lost by the release of hazardous substances," for reimbursement of "incurred past assessment costs," and for "restoration planning and implementation and monitoring oversight costs[.]" (*Id.*) To settle its potential contribution liability as the current owner of Jaite Mill, the United States will pay Paddock $16.5 million. (*Id.* at 9.) Subject to certain reservations of rights, both parties agree not to pursue claims against the other concerning Jaite Mill. (*Id.* at 10–12.)

## II.     LEGAL STANDARD FOR CONSENT DECREES

The Court must ensure "that the proposed [consent decree] will serve the public interest by facilitating restoration of the environment and by adequately compensating the taxpayers for the cleanup costs that will be incurred." *United States v. Grand Rapids, Michigan*, 166 F. Supp. 2d 1213, 1218 (W.D. Mich. 2000) (citation and quotation marks omitted). To do so, the Court must determine whether the proposed decree is procedurally and substantively fair, whether it is reasonable and adequate, and whether it advances the public interest. *See, e.g.*, *United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1426 (6th Cir. 1991); *United States v. Lexington-Fayette Urb. Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (holding that a consent decree must be "fair, adequate, and reasonable, as well as consistent with the public interest" (citation and quotation marks omitted)); *United States v. NCR Corp.*, No. 1:19-cv-1041, 2020 WL 8574835, at

*2 (W.D. Mich. Dec. 2, 2020) (same). By reviewing those factors, the Court ensures that the "consent decree 'is rational and not arbitrary or capricious.'" *NCR Corp.*, 2020 WL 8574835, at *3 (quoting *Akzo Coatings*, 949 F.2d at 1435). In conducting its review, the Court recognizes that the law generally supports voluntary settlements, a policy only "heightened in situations where [potentially responsible parties] enter into consent decrees with the [United States] because the cards have been dealt face up and a crew of sophisticated players, with sharply conflicting interests, sit at the table." *United States v. Cantrell*, 92 F. Supp. 2d 718, 723 (S.D. Ohio 2000) (citation and quotation marks omitted).

### A.  Fairness

In reviewing the fairness of a consent decree, courts consider both procedural and substantive fairness. *See, e.g.*, *United States v. Chem. Waste Mgmt., Inc.*, No. 3:22-cv-132, 2022 WL 4957567, at *3–4 (S.D. Ohio Oct. 4, 2022). The parties' proposed consent decree is fair on both fronts.

#### 1.  Procedural Fairness.

Procedural fairness evaluates "'the negotiation process and attempt[s] to gauge its candor, openness[,] and bargaining balance.'" *Grand Rapids*, 166 F. Supp. 2d at 1219 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 86 (1st Cir. 1990)). The Court should also consider "the strength of [the] plaintiff's case, the good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved." *Akzo Coatings*, 949 F.2d at 1435 (citation and quotations marks omitted).

In this case, the parties engaged in extensive settlement negotiations, including informal discussions, a settlement conference facilitated by the Court, as well as mediation with a private neutral, a magistrate judge, and a district court judge. Throughout the negotiations process, the

parties were represented by experienced and diligent attorneys, all of whom recommended this settlement. What's more, once the parties agreed to the proposed consent decree, it was published for notice and comment and received no objections. The Court is satisfied that the consent decree is procedurally fair. *See, e.g.*, *Chem. Waste Mgmt.*, 2022 WL 4957567, at *3 (finding procedural fairness when there was extensive negotiations and a public comment period); *NCR Corp.*, 2020 WL 8574835, at *3 (finding procedural fairness when the proposed decree "resulted from arms-length negotiations" between the parties, "negotiations took place over many months with capable and experienced counsel on all sides[,]" and the proposed decree "was lodged for public comment as required by law").

    2.  *Substantive Fairness*

Substantive fairness concerns the terms of the agreement and starts from the premise that "'a party should bear the cost of the harm for which it is legally responsible.'" *NCR Corp.*, 2020 WL 8574835, at *4 (quoting *Cannons*, 899 F.2d at 87). "Substantive fairness requires that settlement terms be based upon, and roughly correlated with, some acceptable measure of comparative fault, apportioning liability among the settling parties according to rational (if necessarily imprecise) estimates of how much harm each [potentially responsible party] has done." *Chem. Waste Mgmt.*, 2022 WL 4957567, at *3 (citation and quotation marks omitted). Yet "[r]elative fault is not the only factor that district courts should take into account when appraising the fairness of a settlement." *Id.* (citation and quotation marks omitted). The Court should also consider factors like the parties' litigation risk and the benefits of resolution. *See, e.g.*, *Akzo Coatings*, 949 F.2d at 1435–36; *Grand Rapids*, 166 F. Supp. 2d at 1222; *Chem. Waste Mgmt.*, 2022 WL 4957567, at *3–4.

6

Here, measured on those factors, the proposed consent decree is substantively fair. Under the agreement, the financial burden of cleaning up Jaite Mill will be shared between Paddock and the United States (Doc. No. 120-1, at 7–9), both of which were potentially liable for costs of cleanup as the current and prior owners of the site. On the one hand, the United States alleges that Paddock is strictly liable for substantial pollution caused by two prior owners who operated at Jaite Mill. (*See, e.g.*, Doc. No. 44, at 51–52.) On the other, Paddock alleges that the United States is liable for contribution, and that an equitable allocation of costs should account for the discounted purchase of Jaite Mill and the United States' failure to institute timely remedial measures, which has increased current costs. (*See, e.g.*, Doc. No. 42 ¶¶ 1–9.) Both parties here may have faced substantial liability. *See* 42 U.S.C. § 9613(f)(1) ("In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate."); *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir. 1998) ("Liability for cost recovery actions brought against [potentially responsible parties] under § 107(a) is strict. Liability is also generally joint and several on any defendant [] regardless of fault." (citations omitted)), *abrogated on other grounds*, *Hobart Corp.*, 758 F.3d at 773–74; *U.S. Bank Nat. Ass'n v. U.S. E.P.A.*, 563 F.3d 199, 207 n.4 (6th Cir. 2009) ("The harshness of strict and joint and several liability is mitigated by CERCLA's provisions allowing a party who has been sued under Section 107(a) to seek contribution from any other person liable or potentially liable under CERCLA."). The consent decree strikes a fair balance by allocating the remediation costs between the potentially responsible parties. The fact that both parties have endorsed the settlement strongly supports a finding of substantive fairness. *See United States v. EMR, Inc.*, No. 1:24-cv-09545, 2025 WL 1779184, at *3 (D.N.J. June 27, 2025) (finding that substantive fairness was strongly supported by fact that all twelve named defendants agreed to the settlement). And "no

7

non-party [] has sought to intervene in this case or object to the [c]onsent [d]ecree, suggesting that the settlement terms do not stand to unfairly prejudice others with potential liability, if any." *Id.*

Although the settlement amount *might* be less than the estimated $46.3 million cleanup costs, that does not render it unfair. This settlement covers a large portion (over 70%) of expended and projected costs. *See, e.g.*, *EMR*, 2025 WL 1779184, at *3 (approving CERCLA consent decree that covered about 60% of estimated costs). If this case were to proceed, numerous contested legal issues would need to be resolved. The Court would need to determine whether Paddock is liable as a corporate successor, whether pollution occurred at the site during certain periods, whether the cleanup plans are consistent with applicable law, and how costs should be equitably allocated in light of numerous factors. "[S]ettling this matter now, after years of investigation and negotiation, saves all parties time and expense" and "provides the parties with certainty amidst the risk of litigation." *Chem. Waste Mgmt., Inc.*, 2022 WL 4957567, at *4; *see Akzo Coatings*, 949 F.2d at 1436 (finding consent decree fair in part because the "liability of the settling defendants [was] presently uncertain"); *Cannons*, 899 F.2d at 90 ("The reality is that, all too often, litigation is a cost-ineffective alternative which can squander valuable resources, public as well as private."). In this case, there has been a years-long effort to remedy contamination at Jaite Mill. The Court is "sensitive to [the] desire to finalize a remedial plan and force the [responsible parties] to get on with the job and clean up a long-standing mess." *Akzo Coatings*, 949 F.2d at 1436.

### B. Reasonable and Adequate

The proposed consent decree is also reasonable and adequate. "Factors a reviewing court will consider with respect to reasonableness include the nature and extent of the hazard, the degree to which the remedy will address the hazard, possible alternatives, and the extent to which the decree furthers the goals of statute." *NCR Corp.*, 2020 WL 8574835, at *6 (citing *Akzo Coatings*,

949 F.2d at 1436). The most important of those factors is the consent decree's "likely effectiveness as a vehicle for cleansing" the contaminated site. *Akzo Coatings*, 949 F.2d at 1437.

All parties agree that there is significant pollution at Jaite Mill, and this consent decree will direct $33 million to remedying those harms. The consent decree "represents a meaningful and substantial reimbursement, given the risks inherent in litigation, the challenges of proving liability and apportionment among multiple [potentially responsible parties], and the likelihood that further pursuit of costs would result in delay, uncertainty, and additional expense[.]" *See, e.g.*, *EMR*, 2025 WL 1779184, at *5; *United States v. Cleveland-Cliffs Burns Harbor LLC*, No. 2:23-cv-381, 2024 WL 1827207, at *2 (N.D. Ind. Apr. 25, 2024) ("Entry of the Consent Decree will compensate the government for the costs of the remedial and response measures, and will provide environmental benefits more quickly and at less cost than could be achieved through litigation. Accordingly, the Court finds that the Consent Decree is a reasonable settlement.").

### C. Public Interest

Finally, in the CERCLA context, a consent decree is in the public interest if it facilitates the "timely clean-up of hazardous sites with proportional contribution from the responsible parties." *Chem. Waste Mgmt., Inc.*, 2022 WL 4957567, at *4 (citing *Akzo Coatings*, 949 F.2d at 1439). Here, the proposed consent decree holds both the current and previous owners responsible for their roles in creating or exacerbating pollution. That outcome is consistent with CERCLA's objective of "ensuring prompt effective remedial action while placing the financial burden of the cleanup on the [potentially responsible parties]." *Akzo Coatings,* 949 F.2d at 1439. Moreover, "public policy generally supports 'a presumption in favor of voluntary settlement' of litigation" and that "'presumption is particularly strong'" in a case like this one when "'a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like [the

9

Department of the Interior,] which enjoys substantial expertise in the environmental field.'" *Lexington-Fayette*, 591 F.3d at 490–91 (quoting *Akzo Coatings*, 949 F.2d at 1436).

### III. CONCLUSION

The proposed consent decree is fair, reasonable, and consistent with the goals of CERCLA. Accordingly, the United States' unopposed motion to approve the consent decree is **GRANTED.** The approved consent decree will be **ENTERED** and docketed separately.

**IT IS SO ORDERED**.

Dated: July 16, 2025

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**